SMOLEY v. NEW JERSEY ZINC CO.
No. 5650.

District Court, D. New Jersey.
July 12, 1938.

Addison C. Ely, of Westfield, N. J. (Hammond & Littell [by Nelson Littell] and Albert C. Johnston, all of New York City, of counsel), for plaintiff.

Lindabury, Depue & Faulks, of Newark, N. J. (Pennie, Davis, Marvin & Edmonds [by William H. Davis], Charles W. Riley, and James B. Christie, all of New York City, of counsel), for defendant.

FORMAN, District Judge.

This is a suit brought to have defendant declared a trustee ex maleficio of fourteen United States letters patent[1] and corresponding foreign patents now owned by defendant, and to compel defendant to assign the patents to plaintiff, and to account for all profits derived from the use of the inventions covered by the patents. An injunction is sought restraining defendant from assigning or granting licenses under the patents and from further contesting a certain interference proceeding now pending in the United States patent office involving one of the patents owned by defendant and a patent application filed by plaintiff.

As submitted to this court the suit is based upon the claim of Eugene R. Smoley that he disclosed the "fundamental idea" upon which all of the patents involved are based to employees of defendant under circumstances from which an obligation on the part of defendant not to make use of that idea without plaintiff's consent must be inferred, the "fundamental idea" referred to, being the idea of applying the principle of rectification to separation of metals, particularly zinc, cadmium and lead.

Previous to the alleged conception of this idea it had been the practice to make fine degrees of separation of various fractions of petroleum hydrocarbons, such as gasoline, benzene, kerosene, etc. by distillation and rectification, but it had been impossible to separate zinc from traces of lead and cadmium by normal metallurgical practice.

Smoley's alleged idea of rectifying metals may be described as a process using a vertical column consisting of horizontal plates in the interior. A boiling point is maintained at the bottom of the column, and a condensing point is maintained at the top of the column, permitting vapors to pass countercurrent up the tower, through apertures in the horizontal plates, with liquid coming down and scrubbing the rising vapors. The lower boiling point constituent of the distillate is continuously removed from the top, and in the same manner the higher boiling point constituent is removed from the bottom of the tower.

It is the testimony of the plaintiff that in the spring of 1928, while attending a class in distillation at Massachusetts Institute of Technology "the idea flashed into my mind * * * of applying the principle of rectification to separation of metals".

The first thing Smoley did after the idea came to him was to bring it to the attention of Professor Williams in the Metallurgical School, asking his advice as to the commercial possibilities of the idea, and asking whether in Professor Williams' opinion the idea would be a fit subject for Smoley's doctoral thesis. Encouraged by Professor Williams, Smoley, who had worked for the New Jersey Zinc Company from 1918 to 1923 and was familiar with the metallurgy of zinc and its literature, turned his mind to the possibility of separating zinc from cadmium. He looked up in the available literature the vapor pressures, solubilities and physical properties of zinc and cadmium. He then made some calculations from the vapor pressures, and plotted an X-Y diagram showing the liquid vapor relationship of the components. Following this, he calculated by stepwise calculation "the number of theoretical trays (horizontal plates) for certain feeds to obtain certain purity cadmium overhead and certain purity zinc bottoms in a rectifying tower". As a result of these calculations he became "more certain" that zinc and cadmium could be separated by rectification.

Smoley finished his class work in connection with his master's degree, and with the aim of obtaining financial support which would enable him to carry out his doctoral thesis work on this problem, he planned and carried out a trip beginning about June 1, 1928, which included visits to New York, Washington, D. C., and Palmerton, Pennsylvania, where defendant's plant is located. It was during the period covered by this trip, according to Smoley, that the alleged disclosure upon which this suit is founded were made to various employees of defendant.

---

[1] Patents No. 1,994,345 to 1,994,358 inclusive.

In New York Smoley visited Leon S. Holstein, who was at that time defendant's assistant manager of manufacturing. He testified that he had a talk with Holstein in which the following occurred: "I told him * * * about this splendid idea that I had on separation of metals by rectification, and I remember that in the discussion we spent a good deal of time discussing the various applications of this process".

Smoley also testified that he told Holstein that he was on his way to Washington, and asked Holstein to suggest a patent lawyer located there. As a result of Holstein's recommendation Smoley communicated with Richard L. Scheffler, a patent lawyer in Washington, and told him: " * * * that Mr. Holstein had suggested his name in regard to an idea that I wished to explore further, * * * and I wished to consider it as a Doctor's thesis for experimental work and wished to develop the idea to a point of taking out a patent".

Following this Smoley proceeded to Palmerton, Pennsylvania, where he stayed at the home of Adolph Kummer, an old friend, who was assistant superintendent of defendant's lithopone plant. According to Smoley the first thing he did was to discuss "this new invention of mine", asking Kummer among other things whether he thought he, Smoley, "ought to work it for my Doctor's thesis, and whether he thought I could get the research department to finance such a project".

Continuing, Smoley testified that Edmund J. Flynn, who was at that time superintendent of defendant's lithopone plant and Kummer's immediate superior, joined them at Kummer's home later in the day. He states: "I went into considerable detail with Mr. Kummer and Mr. Flynn developing to them the idea that I had in mind. I made sketches of the tower, I drew in similar fashion to the sketches that were submitted for Mr. Scheffler the X–Y diagram and the steps and explained just how you would obtain this separation of zinc and cadmium as an illustration". According to Smoley there was a discussion of various other matters such as the type of tower, the type of trays, materials of construction, and the heating and condensing units.

On the following day Smoley states that he conferred with Earl H. Bunce, general manager of the Technical Department of the New Jersey Zinc Company. "I told him that I was short of funds and that the purpose of my visit to him was to attempt to get financing for my equipment for my thesis, and a monthly stipend for living. I told him that I had this new idea of rectification and separation of metals and told him that I * * * wanted the opportunity to continue that work on that problem as my Doctor's thesis. Mr. Bunce stated that he would consider this proposition."

Asked to tell as nearly as he recalled how he described his idea to Bunce, Smoley said: "I described it as a process for separating metals by rectification, using the column, boiling at the bottom, condensing at the top, vapors pass countercurrent up the tower with liquid coming down the tower, and taking overhead the lower boiling point constituent of the product, taking off the bottoms the higher boiling point constituent".

According to Smoley, he discussed with Bunce the purification of slabs of the western slab zinc containing cadmium and lead as impurities, but he made no sketches to illustrate the idea to Bunce.

The interview with Bunce ended with a statement by Bunce that he would consider Smoley's proposition and communicate his decision by letter, and with the suggestion that Smoley see certain other men in the research department, particularly Willis M. Peirce and George F. A. Stutz, in order to enable them to form an opinion as to the desirability of re-employing Smoley at the end of his school work.

Smoley testified that following Bunce's suggestion he sought out Peirce, chief of defendant's research department, and Stutz, who was also associated with defendant's research department. He says that he did not mention his idea to Stutz. As to his conversation with Peirce, Smoley testified: " * * * I told him about my proposition or consideration of trying to get the New Jersey Zinc Company to finance me for this work at M. I. T., told him I had completed my Master's degree and was considering going back to take the Doctor's degree, and mentioned the fact that I had this novel idea. I don't recollect going into any detailed discussion with Mr. Peirce of this idea".

Smoley testified that he recalled visiting Clarence J. Lentz, assistant chief of defendant's research division, on that particular trip and having a conversation

with Lentz relative to the rectification of zinc and cadmium.

Smoley stated that he never heard from Bunce with reference to his proposition, and made no effort whatever to induce Bunce to make a response. It is his testimony that after returning to Massachusetts Institute of Technology he made an arrangement with the Standard Oil Company of New Jersey whereby that company gave him $2,000 for experimental equipment and $100 a month during his doctoral year to enable him to work on another thesis subject, a problem relating to the rectification of heavy naphthas.

Upon completion of his doctoral work at school, Smoley took employment with the Standard Oil Company in the fall of 1929, and worked in various refineries of that company in this country until May of 1930, when he sailed for Sumatra where he was engaged in work for the same company until June of 1933, when he returned to this country.

It is Smoley's testimony that in the summer of 1934, about a year after his return to this country, he learned that the defendant was making use of various zinc refining processes and apparatus utilizing the action of a fractionating or rectifying column. Subsequently, he learned that various employees of defendant had filed patent applications covering those methods and apparatus which eventually matured into the letters patent with which this suit is concerned.

The action of a fractionating or rectifying column is utilized in defendant's commercial practice and is involved in the various processes and apparatus covered by the patents in question. Smoley relies upon this fact to establish wrongful appropriation of what he asserts to be an idea belonging exclusively to him.

Defendant in rebuttal to the above testimony has submitted defenses which may be divided into the following categories: (1) A denial that this idea was divulged to its employees by Smoley, and (2) a denial that there was anything novel about the alleged idea.

In support of the first defense defendant has adduced testimony of the various parties to whom the alleged disclosures were made by Smoley on his visit to New York, and Palmerton, Pennsylvania.

Holstein recalled seeing Smoley in his New York office, and that he recommended a Washington patent attorney to him.

He denied that he had any conversation with Smoley at that time or at any time in which the subject of separating metals by rectification was mentioned.

Kummer testified that he remembered the visit of Smoley in 1928, but denied that Smoley mentioned the idea of separating metals by rectification. He admitted, however, that when Smoley visited him in 1928 he had said he was contemplating choosing some zinc problem for his doctoral work.

Edmund J. Flynn also recalled Smoley's visit in 1928, but he, likewise, testified that he had no conversation with Smoley at that time about the use of a rectifying column in the separation of zinc from other metals. He testified that he did recall that Smoley spoke to him "about wishing to do some sort of work as a Zinc Company project in working for his Doctor's degree, and that he intended to see Mr. Bunce, to see whether such an arrangement could be made", but he testified that to the best of his knowledge the problem upon which Smoley hoped to work was not discussed.

Earl H. Bunce testified that Smoley visited him at his office in Palmerton on June 9, 1928, but denied that Smoley disclosed to him at that time any method or apparatus for the separation of zinc from cadmium. He said that on that occasion Smoley stated his need of financial assistance in order to finish his graduate work and asked "whether the New Jersey Zinc Company would be willing to select a research problem" on which Smoley could do his thesis work for which defendant would give him financial assistance. He added that *it was decided not to select any problem* for his thesis work, and that Smoley was advised of this decision by letter dated June 25, 1928, a copy of which was introduced in evidence. The receipt of this letter, however, was denied by Smoley. This assertion that the essence of Smoley's visit was to induce the defendant to finance Smoley's school year in exchange for his research work *on some zinc problem* is corroborated by the minutes of a Technical Department conference held on June 11, 1928, which contain the following item under the heading "Fundamental Metallurgical Work": "Mr. Smoley, who is getting his Doctor's degree at M. I. T. next June, wished to be considered for this position and would like to work his Doctor's thesis on one of our problems".

The employees of the technical and operating staff of the company held numerous conferences of which minutes were carefully preserved and proved in this case.

Lastly, Clarence J. Lentz recalled seeing Smoley and talking with him on the occasion of his visit to Palmerton in June of 1928, but he denied having any conversation with Smoley either at that time or any other time, in which the idea of separating zinc from cadmium and other metals by distillation and rectification was discussed.

Defendant's defense that Smoley's alleged disclosure is destitute of novelty consists of evidence indicating anticipation of the "fundamental idea".

Howard M. Cyr, who has been employed in the research department of the New Jersey Zinc Company since 1919, testified that in 1924 it occurred to him that the manufacture of pure zinc would be a helpful thing to the Zinc Company. He stated: "I had been taught by Dr. Warren K. Lewis in M. I. T. that any two liquids which formed mutual solutions could be fractionated through a rectifying column. He at that time was interested in rectifying columns, and in our chemical engineering course he had given us problems regarding rectifying columns. Therefore, it occurred to me that here was a splendid idea that we could distill this liquid zinc through a rectifying column in a similar apparatus. I, therefore, sat down and inscribed in my notebook a description of the apparatus using a rectifying column to purify zinc".

Cyr's notes dated April 7, 1926 consist of a sketch of a proposed form of laboratory apparatus for treating zinc by rectification and a written description of the apparatus. The sketch, however, differs from plaintiff's alleged idea in that it does not provide for the continuous removal of a distillate from the bottom of the column. Smoley's alleged idea provides for continuous removal at both ends of the column. In the description of the rectifying column Cyr's notes record: "The ideal action would be to have the tower cool enough to condense the zinc at the top to a small extent, to cause some refluxing".

Around 1927 and afterwards defendant was experimenting with the elimination of lead from zinc by passing the vapor upwardly through an extension, or "lead eliminator," of a vertical retort. There was considerable discussion among the members of the technical and operating departments as to what brought about the purification of the zinc in the "lead eliminator". Cyr, with the benefit of his previous experiment, set forth above, believed that rectification was involved and such belief was recorded as follows in the "Minutes of Conference" held May 31, 1928: "Mr. Cyr also pointed out the tremendous advantage to be obtained by condensing lead-zinc vapor and then re-evaporating the zinc; thus obtaining, by the fractional distillation, a much purer zinc vapor".

And in the "Minutes of Conference" held November 5, 1928, it is recorded: "Mr. Cyr then discussed the results of his laboratory tests on lead elimination and pointed out that his findings were corroborating the guess made earlier in the year, namely, that the removal of lead was accomplished by the frequent condensation and re-evaporation action in the lead eliminator. This effect reaches its maximum when molten zinc is being produced but is occurring with somewhat decreasing efficiency at temperatures slightly above the dew point. The results were discussed and it was agreed that the operating practice offered substantial evidence in support of this theory".

He explained these minutes in his testimony as follows: "There had been some diversity of opinion as to the cause of this lead elimination in the previous conferences. I had taken the stand that this was due largely to the rectifying action of the upper part of the column, which caused frequent condensation and re-evaporation there. Some other theories had been offered that this was a mechanical effect. Therefore, I had carried out some laboratory experiments passing zinc and lead vapors through solids in the laboratory. These experiments led me to conclude that my first stand had been substantially correct and that this effect was due, the lead elimination was due to the frequent condensation and re-evaporation rather than to mechanical filtering effect".

On January 22, 1931 at a conference in defendant's New York office attended by Messrs. Hardenbergh, Bunce and Holstein and devoted to the discussion of measures for increasing the quantity of high grade metal, Holstein suggested that slab zinc metal from the horizontal retorts be charged into the top of the "lead eliminator" on the vertical retort. Philip M. Ginder, chief of the slab zinc department, experiment-

ed with this idea early in 1931. The increased purity of the product, however, was offset by the increased labor required for handling the metal and the increased losses resulting from re-distillation. Ginder thought of applying to a horizontal retort the same principle which had been used in the vertical tests previously, and which he believed involved the "scrubbing action" resulting from a rain or spray of molten zinc through the "lead eliminator". To produce the shower or rain effect he used a reflux condenser placed in an inclined position at the vapor outlet of a horizontal retort. After considerable experiment with this reflux column or fractionating column some of the patents in suit were obtained.

Ginder's work in removing lead from zinc in a reflux column led him to believe that cadmium could be removed by similar means. In March, 1932 after trying a large number of fractionating columns of various sizes and heights and a variety of packing material and experimenting with various types of heating units, a saucer type tray-column was developed and a satisfactory degree of purification of zinc with respect to cadmium was attained. This work resulted in other patents here in issue.

The above discussion indicating the defendant's source of the patents in suit is supplemented by the contention that the alleged idea of Smoley was common knowledge even before defendant began work on the problem. To substantiate this defendant introduced in evidence an article from the "Journal of the American Institute of Metals" by John Johnston, published in March, 1918. On page 24 of that article appears the following: "Cadmium could therefore not be eliminated from zinc by distillation without very large losses of zinc, except by the use of a fractionating column which would be difficult to construct and operate".

Before sifting the foregoing evidence to the end that its probative force may be ascertained it will be necessary to refer to the authorities on the problem with the hope that some light may be shed on the proposition.

Our problem is based upon the theory of trusts. Where one person receives a disclosure of an inventive idea upon an express or implied promise not to make use of the idea without the permission of the originator or owner thereof, the courts are zealous to protect the trusting party from a breach of the trust.

In Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, 296, affirmed 7 Cir., 36 F.2d 623, the court stated: "The difference between secret processes and patents is that the owner of a patent has a monopoly against all the world, while the owner of a secret process has no right 'except against those who have contracted, expressly or by implication, not to disclose the secret, or who have obtained it by unfair means.' * * * The jurisdiction of equity to protect such trade secrets is founded upon trust or confidence. The court 'fastens the obligation upon the conscience of the party, and enforces it against him in the same manner as it enforces against a party to whom a benefit is given, the obligations of performing a promise on the faith of which the benefit has been conferred' * * * Whether the subject-matter is patentable or not, if the designer discovers and keeps secret a process of manufacture, though he will not have an exclusive right to it as against the public, after he shall have published it, or against those who in good faith acquire knowledge of it, yet he has a property right, which a court of chancery will protect against one who in bad faith and breach of confidence undertakes to apply it to his own use".

Relief has been granted in numerous cases in which a breach of confidence has been disclosed. The following cases are those in which one party took advantage of the confidential disclosure by obtaining patent rights. Becher v. Contoure Laboratories, Incorporated et al., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752, reported below in 2 Cir., 29 F.2d 31; Murjahn v. Hall, C.C., 119 F. 186; and Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, certiorari denied, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395. It is to be noticed, however, that in each of these cases there was a complete disclosure of the idea as well as the manner in which it was to be perfected. The case of Allen-Qualley Co. v. Shellmar Products Co., supra, contains one minor variation from the above cases. The plaintiff demonstrated an idea and the method of accomplishing that idea to the defendant in confidence. The defendant investigated the matter and found that it had previously been patented by another party from whom the defendant immediately purchased the patent rights. The court ordered an assignment of the patent to the plaintiff, because fair dealing would have required defendant to

give plaintiff the first opportunity to purchase the patent rights. In this case as in the other cases the plaintiff made a complete disclosure of his idea, and the fact that the idea was already patented seems immaterial.

Plaintiff contends that it was unnecessary for him to disclose to the defendant exactly how his process of rectification should be accomplished. His point is that the gist of the Smoley invention was in the idea that the practice existing in the alcohol and petroleum industries of effecting fine degrees of separation of mixtures of liquids by distillation and rectification in a rectifying column, involving continuous condensation and refluxing of liquid countercurrent to rising vapors, could be applied to the separation of mixtures of metals.

Plaintiff's argument amounts to no more than an assertion that the application of a new function to an old art may amount to invention. Indeed, the case of Hobbs v. Beach, 180 U.S. 383, 21 S.Ct. 409, 45 L.Ed. 586, indicates that this contention is by no means without foundation. In that case it was urged that the plaintiff's patented machine was anticipated by the prior art. Substantially, the only thing plaintiff had added to the prior art was a new function. The court stated that it involved invention to see that the prior art was adaptable to the work of plaintiff's device and that plaintiff's invention consisted rather in the idea that such a change could be made than in the making of the necessary adjustment. This case is not dispositive of the instant case unless Smoley's idea was inventive, and it was not inventive unless it was novel.

New Jersey Zinc Co. v. Singmaster et al., D.C., 4 F.Supp. 967, affirmed as to principal issue in 2 Cir., 71 F.2d 277, certiorari denied, 293 U.S. 591, 55 S.Ct. 106, 79 L.Ed. 685, involves a case where the defendant agreed to assign to plaintiff all "patentable ideas" conceived by him while in the employ of plaintiff, and in which the court ordered an assignment of the patent perfected after the termination of the employment contract, but which was derived from an idea conceived during employment. The case does not stand for the proposition that an employer may have an assignment of a patent in such a case where only the idea was conceived during employment, because the court specifically found that the defendant made an admission in writing that he had conceived the idea upon which the patent was based, and the means to perfect it while in plaintiff's employ.

A further condition to recovery is that the idea disclosed must be novel. Flanigan v. Ditto, Inc., 7 Cir., 84 F.2d 490, 495. A duty not to use an idea already known cannot be created by virtue of the fact that one makes a confidential disclosure of that idea. Masland v. Du Pont de Nemours Powder Co., 3 Cir., 224 F. 689, 693, reversed on other grounds, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016. If the rule were not so restricted it is obvious that by disclosing an idea under delusions of confidence, the person making the disclosure could thereafter prevent the confidante from subsequently making use of it, even though the idea was well-known prior to the date of the disclosure and open to the use of all others in the world.

If these cases are controlling it must first be decided whether Smoley made an adequate disclosure of a novel idea in confidence to the employees of the defendant as alleged.

The evidence is conflicting. On the one side we have Smoley who categorically states that he discussed his new idea with the employees of defendant. On the other side we have the employees with whom Smoley states he discussed the idea, but who emphatically deny that Smoley mentioned the rectification of cadmium, zinc and lead. The case, therefore, resolves itself into a determination of what actually took place, or more precisely, what probably occurred.

Smoley by his own testimony never progressed further than a conception of the idea of rectification supplemented by his calculations and research. His idea is destitute of any practical tests. Furthermore, he testified that as a result of his calculations he became "more certain" that zinc and cadmium could be separated. He recalled that he told Holstein that he wished to "explore further" his idea. These assertions coupled with the fact that his idea was not substantiated by practical tests induce the court to believe that he was to a great extent theorizing at the time he made his trip to New York, Washington and Palmerton, Pennsylvania.

It appears that the defendant's employees were thinking about rectification of metals as early as 1924, but were unable to make any progress with the idea until

1931, and then the evolution of its perfection was by slow and almost imperceptible stages. Cyr testified and his notes introduced into evidence indicate that he was experimenting with rectification in 1926 on a small scale. The theory of rectification became more pronounced in 1927 when defendant was experimenting with the vertical retort and the "lead eliminator", but this speculation notwithstanding Smoley's visit in 1928 did not materialize until 1931, when the reflux condensers were applied to the old horizontal retorts and used in separating lead from zinc. And even then a considerable period of time elapsed and many experiments were made before the same process could be used in the separation of cadmium from zinc. This slow process in which the patents in suit were perfected leads the court to believe that Smoley's alleged disclosure of 1928 is insufficient. A complete disclosure of a workable idea would have enabled defendant to perfect its method much sooner.

Some weight must be given to the Johnston article published in March of 1918 which stated that cadmium could not be eliminated from zinc without large losses of zinc except by the use of a fractionating column. Smoley contends that the author was not thinking about a rectifying column, because a fractionating and rectifying column were not the same thing in 1918. It is admitted, however, that they are the same thing today, and defendant has introduced persuasive evidence that the two were synonymous in 1918. Furthermore, it has been shown by a collection of papers written by Smoley in February of 1923 while in the employ of defendant's research department that Smoley was familiar with this article written by Johnston. There is grave question but what this knowledge of Johnston's theory constituted the substance of Smoley's thoughts and ideas on the subject in 1928. It is possible that consciously or subconsciously Smoley utilized this and crystallized it into what he has persuaded himself now is his own original thought and idea.

The court is of the opinion that the mere idea that rectification could be applied to the separation of metals was not novel to the defendants in 1928, and that plaintiff has failed in his proof.

It seems more probable that Smoley at the time he made his visits to New York, Washington and Palmerton, Pennsylvania was chiefly concerned with obtaining the financial support of the defendant in aid of his doctorate from Massachusetts Institute of Technology in exchange for his research work on *some problem* rather than the specific problem of rectification of metals. This supposition is buttressed by the facts that no mention of his idea concerning rectification of metals was made in the Technical Department Conference of June 11, 1928 or in the letter mailed to Smoley on June 25, 1928, declining the offer of his services. These records indicate only that Smoley's proposal to work on *some zinc problem* would not be accepted. This conclusion is even more convincingly supported by the fact that Smoley abandoned this idea of rectification that "flashed in his mind" in the spring of 1928 in favor of another problem upon which to work in conjunction with his doctoral thesis. Had this idea been so revolutionary it is inconceivable that he should have held it in abeyance for so long a period of time.

In summary the court finds that whatever idea Smoley had about rectification in 1928 it was premature and had not reached a reasonable certitude at the time of his visit with the employees of defendant. Furthermore, there was no novelty in this idea to the defendant.

A decree will be entered dismissing the complaint.

The issues raised by the complaint and answer having been met squarely, the relief prayed for in the counterclaim is otherwise granted and the same is, therefore, dismissed.

This memorandum is designed to meet the requirements of Equity Rule 70½, 28 U.S.C.A. following section 723, with regard to the filing of findings of fact and conclusions of law.