## ACKERMANS v. GENERAL MOTORS CORP. et al.

### Civ. No. 5460.

United States District Court
D. Maryland.
Oct. 29, 1952.

Nelson Moore and William D. Hall, (of Moore & Hall), Washington, D. C., and Richard S. Wright (of Barton, Wilmer, Bramble, Addison & Semans), Baltimore, Md., for plaintiff.

Arthur Raisch, William S. Pettigrew, Barnes, Kisselle, Laughlin & Raisch, Detroit, Mich., and R. Dorsey, Watkins and John W. Avirett 2d (of Piper & Marbury), Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, Chief Judge.

■ This is an infringement suit based upon a patent for a folding top for automobiles, No. 2,549,153, issued April 17, 1951, to the plaintiff, John W. J. Ackermans, upon application filed May 1, 1946. The principal defendant is General Motors Corporation, organized under the laws of Delaware, with an assembly plant in Baltimore. The other defendant, City Chevrolet Company, is a Maryland corporation, with its regular place of business also in Baltimore. It is alleged that both defendants have used and sold automobiles manufactured by one of the defendants, General Motors Corporation, with folding tops which infringe the Ackermans patent.

There are 18 claims in the Ackermans patent, but only eight of these are in suit, namely, Nos. 5 to 12, inclusive. Defendants have denied infringement and have also asserted invalidity of the patent. Plaintiff further claims that the principal defendant, General Motors Corporation, is guilty of unfair practice in that it violated confidential disclosures made to it by Ackermans with respect to his device, while his application for a patent was in the Patent Office.

The patent recites that "This invention relates to collapsible tops for motor vehicles, and more particularly to an improved top construction so designed as to provide maximum seating capacity, spare wheel and luggage space, and a smaller top booth inside the vehicle to provide minimum interference when the top is moved to the collapsed position." The patent also sets forth that "A great deal of effort has been devoted to the design of collapsible tops, but the tops heretofore developed have possessed inherent disadvantages in that they have been cumbersome to operate and did not possess any readily operable positive means for locking some of the top bows in predetermined up or down position to provide a rigid construction that would withstand the vibrations and shock loads to which tops are subjected in use, and prevent rattle of the actuating means."

Among the several objects of the invention set forth in the patent is the following, which has been particularly stressed in the trial by the patentee: "the provision of an improved separable juncture seal or barrier associated with the lower forward

portion of the top fabric extending downwardly within the body and its inner wall adjacent to the belt line, whereby the top fabric or material remains inside the body at all times and need not be manually moved to the outside of the body surface to prevent leakage after the top has been raised to the up or elevated position."

The broadest claim in suit is No. 8, and claims 5 and 12 are the narrowest, but plaintiff relies most upon claim 9, which reads as follows: "A vehicle body having an inner side wall terminating in a belt line and a folding top comprising flexible top material having its lower rear edge secured to a portion of said body adjacent said belt line and having forwardly of said position a prolongation of said material extending downwardly within said body, a folding pillar hinged to said body, said material being secured to said pillar, and a cushion associated with said prolongation and inner wall when said top is in raised position and forming a separable weatherproof juncture adjacent said belt line permitting said top being put in lowered position, said downwardly extending prolongation remaining within said body in the raised and lowered positions of said top and thus leaving said belt line exposed as viewed from outside. said body."

It will be seen that the elements of the invention as disclosed by claim 9, when shorn of the refinements of technical language, are the following: (1) a vehicle body having an inner side wall the top edge of which is called a belt line; (2) a folding top made of flexible waterproof material with its lower edge secured to the body of the vehicle adjacent to the top edge of the rear of the inner side wall of the vehicle; (3) a forward extension of this flexible material extending downwardly within the body of the vehicle; (4) a folding pillar, with the flexible material secured to it, hinged to the body of the vehicle; and (5) a cushion attached to the outer side of the flexible material so that, when the top is raised by raising the hinged pillar, the flexible material is thereby stretched and the tension thereon pushes this cushion against the inner side wall of the car. In other words, the basic idea

is akin to that embodied in the modern type of umbrella, which, when not in use, it is desirable to have in a folded position, taking up the least possible space and being as inconspicuous as possible. When raised for use, the waterproof fabric is thereby stretched over the umbrella's ribs, making the fabric taut.

It is obvious from the aforegoing analysis, and indeed it is conceded by plaintiff, that all of these elements are old. In three of the other claims in suit (Nos. 5, 11 and 12) there is an additional element consisting of a trough within the body of the car, below the juncture of the cushion flap with the inner side wall of the body when the top is in raised position, the purpose of this trough being to receive any leakage of water through this juncture. There is provision for operating the Ackermans folding top by an electric motor or other power unit actuated by compressed air, vacuum or hydraulically, with a control button on the dash of the car. This motor automatically propels the pillar up and down, at the will of the operator, without his having to leave the driver's seat. Also, there is a latch adjacent to the windshield. When the top has been raised to full position by the motor, it is then only necessary for the driver to reach above his head and operate the latch, which holds the top in permanent position, until it is manually unlatched and lowered by the motor. However, this power mechanism for raising and lowering the top forms no part of the claimed invention of the patent.

Turning to the defendants' folding top device, there are four major similarities between it and the Ackermans device: (1) there is in both devices an elongated cushion attached to the flexible fabric which is pressed against the inner side wall of the car when the top is raised; (2) both devices have a folding pillar functioning in substantially the same manner; (3) in both there is the automatic character of the operation of the folding top,—an operation which is accomplished without the driver leaving his seat, this mechanism, however, as we have already pointed out, not being involved in the claims of the Ackermans patent in suit; and (4) both devices

have a water-trough below the belt line, that is, below the fabric. In Ackermans this trough is located just below the fabric, while in the General Motors device the fabric extends down to, and connects with the trough, which is lower than the Ackermans trough.

It is so apparent that the two devices as thus analyzed are substantially equivalent in combination of elements all of which are old, that there is no need of further comparative analysis. It therefore becomes necessary to consider whether or not Ackermans' patent is valid, since, if it is, it is infringed by General Motors' device.

Counsel for Ackermans admits that all of the elements of Ackermans' folding top which we have just analyzed are old in the art but maintains that, as embodied therein, they represent a combination not previously disclosed which rises to the dignity of invention. With this we cannot agree. At the outset, in considering the question of validity, we must not lose sight of the fact that we are not concerned in the present case with the automatic device whereby Ackermans' folding top is operated. Nor is there any relevancy in the patent to Mackie and Duluk, No. 2,569,724, issued October 2, 1951, which was assigned to General Motors. The object of the Mackie device is to provide an *automatic fastening* and *sealing means* at the top and sides of the tonneau of the so-called convertible automobile. When the top is raised, the device automatically goes into action and binds the top material against a sealing strip that is fastened to the top of the tonneau.

As respects the prior art, we find that the weight of the credible evidence supports the defendants' position that there was public use as early as 1936 of the folding top of the V-8 model Cadillac car (defendants' gray exhibit No. 2), and that this Cadillac top was substantially the same as the Ackermans top. We likewise find public use proven as early as 1939 of the top used on the 1938 model Mercedes car (defendants' dark green exhibit No. 22) which was substantially the same as the Ackermans top. No pressure plate, for the purpose of making the water-proof fabric fit more snugly along the inner side wall of the car, was relied upon in these earlier devices, nor is it involved in Ackermans. In these earlier folding tops there was a juncture of the flexible fabric with the belt line of the car at or near its top, or a fastening of this fabric, at varying depths, to the body of the car below the belt line; keeping it tight and snug along the belt line in varying degrees, by application of stretching pressure when the top was completely raised; and also by weather-stripping the belt line, as was done in the 1936 V-8 model Cadillac.

It is true that in the Ackermans top the cushion which serves the same general purpose as weather-stripping is attached to the fabric instead of to the belt line of the car. In the present General Motors model (defendants' silver exhibit No. 14–A), the cushion is, in fact, sewed into or encased in the fabric along the belt line. Also, it is true that placing the weather-stripping or cushion along the belt line appears to have been resorted to primarily in order to prevent injurious friction against the flexible fabric, rather than for water-proofing purposes, or for making the fabric lie more snugly along the belt line. However, we believe that this in no sense negatives anticipation. We are satisfied that the two earlier disclosures, first referred to above, are sufficient to anticipate Ackermans. Further, we believe there would be anticipation even had there been no cushion attached to the flexible fabric, or any weatherstripping attached to the belt line of the car in any earlier disclosure since, as we have already pointed out, such addition cannot reasonably be said to impart any degree of novelty to the combination of the old elements involved. It is significant that none of these prior uses were disclosed to the Patent Office at the time Ackermans' application was before it.

In view of our conclusion that Ackermans is so clearly anticipated by prior art use, as above explained, we find it unnecessary to analyze the various prior art patents which the Patent Office considered, or those on which defendants rely, such as, for example, the patent to M. Beson-

neau, No. 2,185,581, issued January 2, 1940, on application filed October 26, 1935. Besonneau, while involving a much more intricate mechanical device for raising, lowering and disposing of motor vehicle hoods or tops within the body of the car, appears to anticipate the much more simple device of Ackermans in all respects, except use of the cushion where the flexible fabric and the side of the vehicle meet. We feel, however, we have already sufficiently analyzed this element of Ackermans to show its failure to add any real novelty or improvement over the prior art.

■ The utility of Ackermans is not open to question. But Ackermans himself testified that the crux of his invention, namely, the novelty of his device, is embodied primarily in the socalled cushion attached to the flexible fabric, that is, the padding or thickening of this fabric where it is stretched along the belt line in the body of the car. However, it is perfectly clear to us that no novelty lies in this use of the cushion. This is a form of weatherstripping old in many arts before Ackermans' application in 1946,—weatherstripping used in horse-drawn vehicles, automobiles, house doors, windows, and in innumerable other ways. It is merely a question of degree of the thickness of such weatherstripping or cushion and the closeness with which it is fitted, whether the desired purpose is accomplished. In certain fields, as, for example, in chemistry and some of the mechanical arts, very slight variations in the amount and character of use of various elements is of vital importance; but in a situation such as here presented, where we are dealing with the use of common-place material in a common-place and long-established manner, reliance upon such refinements is not permissible for the purpose of establishing one's right to a patent.

To summarize: we must not lose sight of the fact that we are here dealing with well known, common elements. Leaving out of consideration, as we must, the automatic operation of the Ackermans device, because the automatic method of operating the top is an essential element in both the combination of Ackermans and that of defendants, and is not here in issue, there is nothing new in the method of extending and snugly fitting the flexible fabric of the top, —when raised,—to the sides of the car, nor in the manner in which this flexible material is deposited and retained in the body of the car.

The Supreme Court, in Great Atlantic & Pacific Tea Company v. Super Market Corporation, 340 U.S. 147, at pages 150–152, 71 S.Ct. 127, at pages 129–130, 95 L. Ed. 162, in finding invalid a patent for a cashier's counter and movable frame for "cash and carry" grocery stores, said:

"It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term 'combination' to imply its presence and the term 'aggregation' to signify its absence, thus making antonyms in legal art of words which in ordinary speech are more nearly synonyms. However useful as words of art to denote in short form that an assembly of units has failed or has met the examination for invention, their employment as tests to determine invention results in nothing but confusion. The concept of invention is inherently illusive when applied to combination of old elements. This, together with the imprecision of our language, have counselled courts and text writers to be cautious in affirmative definitions or rules on the subject.

" * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower

court scrutinized the claims in the light of this rather severe test.

\* \* \* \* \* \*

"Courts should scrutinize combination patent claims with a care proportionate to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

We believe that the above-quoted language of the Supreme Court is directly applicable to the Ackermans patent.

■ We come, finally, to the claim by the plaintiff of unfair practice on the part of the defendant General Motors in the use of information regarding Ackermans' invention. More specifically, plaintiff claims that General Motors improperly used, in developing the Mackie patent, the idea about the movable cushion which the plaintiff had disclosed in confidence. We find that this contention of the plaintiff is not sustained by the weight of the credible evidence. Plaintiff has the burden of proving the disclosure was confidential. The testimony of all of the persons who actually worked on the General Motors folding top which was evolved following the Mackie patent, including both the Mackie patentees, is to the effect that they never saw or heard of the Ackermans idea before they developed their own top. In addition to this fact it is asserted on behalf of General Motors that it is self-evident it did not copy the Ackermans disclosure because the two devices, as defendant claims, are different. But even finding, as we do, that this is not the case, we are still forced to the conclusion that plaintiff's contention of improper use of his disclosure is not borne out by the weight of the credible testimony. See American Potato Dryers v. Peters, 4 Cir., 184 F.2d 165; Smoley v. New Jersey Zinc Co., D.C., 24 F.Supp. 294.

■ Ackermans admits that in 1946 and 1947 he submitted his idea to a large part of the motor industry at or about the same time that he submitted it to General Motors; and there is nothing in the testimony that indicates that he gave to General Motors or any of the other companies to which he submitted his device, the impression that what he was disclosing was confidential. He gave the same information to Ford, Chrysler, Kaiser-Fraser, and several other automobile manufacturers. This being true, we believe there is insufficient evidence to indicate that what Ackermans disclosed was, in fact, confidential, or intended to be so. We will assume that if it, in fact, amounted to disclosure of something that was novel in the art, even though not rising to the dignity of patentability, one who takes advantage of such disclosure may generally be made accountable for profits thereby derived at the expense of the person making the disclosure. Monopoly of a patent entitling a patentee to damages for infringement commences only when the patent is granted. However, where, in advance of the granting of a patent an invention is disclosed in confidence and one, in breach of this confidence, manufactures and sells articles embodying the invention, such person is held liable for profits and damages resulting therefrom, not by virtue of the patent law, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another. As a part of this latter principle it is well settled also that where there is involved an unpatented device, the existence and use of which is proven only by oral testimony, the proof of violation of the confidence must be clear and satisfactory and beyond a reasonable doubt. And the same rule is to be applied against one who admittedly receives a disclosure from an inventor and then proceeds to manufacture things of similar character

and when called to account answers that he is using his own ideas and not ideas imparted to him. See Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801; Mycalex Corporation v. Pemco Corporation, D.C., 64 F.Supp. 420.

Counsel for plaintiff argues that in the present case he has proved that General Motors did rely upon his disclosure to it in developing its device. However, we believe the contrary to be true by the weight of the credible evidence. Counsel for plaintiff stresses the fact that when Ackermans submitted his application for his patent to General Motors in 1946, it was turned over to one Coppock, then director of the experimental and development section of Fisher Body Division of General Motors, and also to one Kubacka, assistant to the senior engineer of the design engineering department of the same division of General Motors. Plaintiff's counsel emphasizes the admission on the part of General Motors that Coppock was supervisor of the department for sealing convertible tops that were used on the 1950 and 1951 models of General Motors' automobiles; further, that a patent application is now pending in the names of Coppock and one Compton on behalf of General Motors, showing means of sealing used in the 1950 and 1951 models; and also that in this application it is stated by counsel for the applicant that the broad invention of the application resides in the use of weatherstripping of the fabric, particularly a foam rubber weatherstripping that is sewed into a pocket of the folding top fabric. Without, of course, attempting to predict the ultimate action of the Patent Office with respect to this application, we would say parenthetically that we find that there is no invention in the use of the weatherstripping, whatever counsel for General Motors in that particular application may have thought to the contrary.

To conclude: we do not believe that the aforegoing testimony is sufficient to overcome the testimony to which we have previously referred, namely, that what Acker-

mans divulged was not, in fact, relied upon in the development of the General Motors device.

For the aforegoing reasons, a decree will be signed in accordance with this opinion, holding that (1) the folding automobile top of defendant would infringe claims Nos. 5 to 12, inclusive, of the Ackermans patent were the latter valid; but (2) the Ackermans patent is invalid because anticipated by the prior art, and (3) General Motors did not make improper use of any disclosure made to it by Ackermans of his device while his application for a patent thereon was pending in the Patent Office.