GLOBE TICKET COMPANY, appellant,

*v.*

INTERNATIONAL TICKET COMPANY and another, respondents.

[Argued November 20th, 1918.   Decided March 3d, 1919.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Lane, who filed the following opinion:

Suit is brought to obtain an injunction restraining defendants from using, or imparting information with respect to, a device alleged to be the exclusive property of complainant by reason of its being a trade secret.

It is called a barrel numbering head, and is used for the purpose of successive numbering of coupon tickets. While no new mechanical principle and no new mechanical appliances were used, there was a novel use of familiar principles and appliances which resulted in the perfection of a head which might be used in connection with a rotary press for the continuous successive numbering of tickets. The evidence is that up to the time of the perfection of this device there had not been in existence any apparatus which could be used upon a rotary press for such purpose. The invention permitted an enormous increase in production. It was, admittedly, an improvement upon anything that had gone before. Its use contributed largely to the successful building up of the business of the Globe Ticket Company. It was used exclusively by the Globe Ticket Company until October, 1913. No attempt was ever made to patent it, the explanation being given that its owners considered a "padlock better than a patent." The Globe company, undoubtedly, was adverse to the details of the construction of this device being disclosed to a competitor. It was, however, used on a machine in the open shop where it might be seen by any of the employes or visitors. It was of such construction, however, that a mere

casual inspection would not, I think, suffice to impart sufficient information to anyone so that it might be reproduced.

Certain employes connected with the machine shop were assigned to the duty of cleaning the heads when necessary and of taking them down and repairing them. These men were ordinary mechanics employed at ordinary mechanics wages. There was no definite contract entered into between the company and any of its employes which would forbid the disclosure of the alleged secret, nor is there sufficient evidence to permit me to find that any of the employes were definitely instructed that they were not to disclose any information they might acquire. The defendant Titus was employed by the concern some twenty-three years ago as an apprentice. He left in March, 1913. For some years prior to his leaving he had worked on the barrel head, had taken it apart and reassembled it. While he testifies that he was never instructed that the device was of secret construction, and I find no evidence upon which I can base a conclusion that he was, yet he and the other mechanics unquestionably knew that the complainant did not desire that the details of the construction should be disclosed. It chose to rest upon its ability to hold its employes in its employ, or upon the chance that none of its employes would have the necessary mechanical ability to reproduce the machine even if they were permitted to examine the interior construction.

In the year 1913 there was considerable dissension in the plant of the complainant. The morale of its officers seems to have broken down. Employes were leaving right and left. There was in existence, in Providence, Rhode Island, a concern known as the Sun Ticket Company, of which one Manshel was president and general manager. On February 22d, 1913, Titus applied to Manshel for a position with that concern. He represented to Manshel that he had had seventeen years' experience with the Globe Ticket Company, and I am forced to conclude that his experience with the barrel numbering device was referred to, for immediately after this employment with the concern on March 10th, 1913, he started to build such a machine. Manshel denies that at the time he knew that the device was considered by the Globe company as its exclusive property, or that he knew that

Titus was under obligation not to use, in the interests of the Sun Ticket Company, the information which he had acquired at the Globe company's plant. Titus denies that he considered that he was under any obligation to refrain from using information that he had acquired at the plant of the Globe company. In view of the action of the officers of the complainant, which will be hereafter adverted. to, it seems to me that while. Titus and Manshel knew that the Globe company was adverse to this barrel numbering head being used by a competitor, yet they considered that they were under no legal or moral obligation, the one not to impart and the other not to use, information acquired by Titus while in the employ of complainant. It is significant that when Titus went to Manshel he received no compensation for the information that he had obtained at the plant of the Globe company. On the contrary, he was paid a dollar less a week wages. If he thought that he had a tremendous secret to disclose it would seem as if he would have bargained for more than mechanics' wages.

The machine built under the supervision of Titus was completed in October, 1913. While it is somewhat different in its construction and operation than the device used by complainant, the basic idea is the same. It is an improvement upon the device of complainant, but not so different in construction and operation as to make it a new device. It is conceded by Titus that if he had not had the information acquired at the Globe company's plant he would never have thought of what he calls his own device. In this respect this case is within *Stone* v. *Grasselli Chemical Co., 65 N. J. Eq. 756.*

We come now to the action, or lack of action by complainant, after Titus left, upon which I think the case depends. Titus made no secret of his intention to leave and become connected with the Sun Ticket Company. The officers of the complainant knew that Titus had the information necessary for him to have to reproduce the barrel numbering head. In 1914, the Sun Ticket Company began printing coupon theatre tickets, and it was apparent to the officers of the complainant that they had been printed upon a device which performed the same function as the barrel numbering head of complainant.

It is perfectly apparent from an inspection .of the various strips of tickets that have been put in 'evidence here that it is not difficult to determine whether the strips have been printed upon a flat press or upon some machine by which the figures are put on at different times rather than by one impression. The irregularities which appear upon the tickets printed upon the flat press or band machine as described by Mr. Keen, if there are any, are regular, whereas the irregularities which appear upon the tickets made by the barrel head device are irregular. It is perfectly clear to me that the complainant well knew in 1914 that Titus had made use of the information which he had acquired at the complainant's plant, and that the Sun Ticket Company was using that information. In 1914, competition on the part of the Sun Ticket Company increased. Herring admits that the Sun Ticket Company could not have produced the article it did without using a device performing the same functions as the barrel numbering head. The complainant knew that another of its employes possessing information with respect to this device was associated with the Sun Ticket Company. In February and March, 1915, there was brought to the attention of the complainant letters written by Titus to a concern in Chicago offering to build for that concern an apparatus which would contain this barrel numbering head. Competition had steadily increased. In June, 1915, Manshel visited the vice-president and general manager of the complainant with the idea of offering to complainant the plant of the Sun Ticket Company for sale. In that conversation Pope, vice-president and general manager of complainant, charged Manshel with being a business crook, with having enticed away employes of complainant. Titus must have been referred to specifically, for Keen, the secretary, was sent for to attend the conference to verify a statement made by Pope to Manshel that Titus had offered to sell to the Chicago concern the barrel numbering head device.

There is no doubt, I think, but that at. this conversation the facts that Titus had given to the Sun Ticket Company information which he had acquired at the Globe Ticket Company plant, and that the Sun Ticket Company was using this information and was numbering tickets with the barrel numbering head de-

vice, were referred to.  Manshel denied none of the statements of Pope.  Indeed, I think it clear that his possession of this information was used by him as a reason why the complainant should purchase the plant of the Sun Ticket Company.  It is not asserted that at the conference any official of the complainant made any claim of exclusive right to the device.  The most that Pope claimed was that Manshel had not acted in accordance with good business ethics.  Manshel, unquestionably, left the conference with the idea that Pope considered that he, Manshel, had acted in a way that was unfair, so far as business ethics were concerned, but certainly with no idea that Pope or the complainant considered that Titus had violated any legal right of complainant.  Indeed, the conversation, so far as Pope is concerned, may be summed up in this that he practically said to Manshel: "You got this information you are using it; I cannot stop you but you are a crook for doing it."  After consideration, the offer of the Sun Ticket Company to sell out was declined.  While there is no evidence that at the board of directors' meeting there was discussed the fact that the Sun Ticket Company was using this barrel head device there is evidence that almost everything else was discussed.  There is evidence that the possession by the Sun Ticket Company of the alleged secret was of the utmost importance and was thought one of the important factors to be considered in the sale, and it is hard to escape the conclusion that there was discussion with respect to this matter.  During 1915 and 1916 competition between the Sun Ticket Company and the complainant became more bitter.  In February, 1917, the International Ticket Company was formed.  That concern was a consolidation of the Sun Ticket Company, the Rockwell Machine Company and the Manshel Machine Company.  The assets of the three concerns were conveyed to the International company, and the stock of the International company issued in payment therefor.  So far as the Rockwell Machine Company stockholders are concerned, there is no evidence whatever that any of them had anything to do with Manshel, or with the Sun Ticket Company, or with Titus or had any knowledge that the Sun Ticket Company was using or might be charged with using the secret device of the Globe company.  There can be no doubt but that

the ability of the Sun Ticket Company to number tickets by this barrel numbering device entered materially into the price fixed upon the assets of the Sun Ticket Company. It seems to me that the intervention of the International Ticket Company created a complete change of conditions. The International Ticket Company used the barrel numbering head device, and complainant permitted it to. Nothing whatever was done by complainant until August, 1917. It then sent an operative to the plant of the International Ticket Company, who obtained employment and made photographs of the device used by the International company. Her report came in in a few weeks, but it was not until the 26th day of December, 1917, that the bill in the present case was filed. From June, 1915, to August, 1917, no additional information came to complainant indicating that the Sun Ticket Company or the International Ticket Company was using this device. Whatever information complainant had it had by June, 1915. Indeed, during the year 1914, it had information upon which it might have acted. It certainly had in 1915. I do not believe that the complainant had any intention of endeavoring to prevent either the Sun Ticket Company or the International Ticket Company from using this device until competition became so keen in 1917 that it began to look around for some possible means of preventing it.

I think both upon the ground of acquiescence and laches the bill should be dismissed. It is true that the defences of laches and acquiescence while cognate are not co-relative. Mere delay may constitute laches which will prevent relief, if conditions have changed. Acquiescence implies assent. And it is true that action, or lack of action, occurring during the commission of a wrong may constitute acquiescence or estoppel which would not have the same effect if occurring after the performance of the wrong. *De Bussche* v. *Alt, 8 Ch. Div. 286, 314.* In this case, however, the wrong was a continuing wrong. Complainant is entitled to the benefit of its secret device so long only as it preserves its secrecy.

It will have the aid and assistance of the court under certain circumstances in preserving secrecy. Consent to a disclosure or the use by another bars relief. Delay in applying for relief with knowledge of the circumstances may be considered as an element

of evidence in determining whether or not there has been acquiescence.

The distinction between laches and conduct evidence which may show acquiescence or election is clearly made in the case of *Faulkner* v. *Wassmer, 77 N. J. Eq. 537,* citing *Dennis* v. *Woglom, 44 N. J. Eq. 513,* and *Clampitt* v. *Doyle, 73 N. J. Eq. 678.*

Considering all of the testimony, I find complainant acquiesced in the continued use of this alleged secret device by the Sun Ticket Company and the International Ticket Company. With respect to laches the rule is well settled that while under ordinary circumstances a court of equity follows the statute of limitations, yet when extraordinary circumstances intervene the court will disregard the statute and determine the case upon equitable principles. In this case with knowledge, as I have found, of facts sufficient to charge it with knowledge that Titus was disclosing the alleged secret and that the Sun Ticket Company was using it, and with knowledge imputed to it of the fact that under the law it was necessary to protect its right to preserve the secrecy of the alleged device, complainant failed to act until December, 1917. In the meantime, the building up of a prosperous business by the Sun Ticket Company had been permitted, the International Ticket Company had intervened, purchased the assets of the Sun Ticket Company, into the value of which, undoubtedly, entered the right of the Sun Ticket Company to use this device. Under the circumstances, I think the doctrine of laches applies.

Upon the main issue I have considered the cases of *Solomon* v. *Hertz, 40 N. J. Eq. 400; Stone* v. *Grasselli Chemical Co., supra; Fleckenstein Brothers* v. *Fleckenstein, 66 N. J. Eq. 252; Vulcan Detinning Co.* v. *American Can Co., 70 N. J. Eq. 588; S. C., 72 N. J. Eq. 387; Pomeroy Ink Co.* v. *Pomeroy, 77 N. J. Eq. 293; Taylor Iron and Steel Co.* v. *Nichols, 70 N. J. Eq. 541.*

I will advise a decree dismissing the bill, with costs. Let decree be settled on two days' notice.

*Mr. J. Edward Ashmead* and *Mr. Frank Smith* (of the Pennsylvania bar) with him, for the appellant.

*Mr. Eugene W. Leake,* for the respondents.

PER CURIAM.

The decree is affirmed, for the reasons given by Vice-Chancellor Lane.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, HEPPENHEIMER, WILLIAMS, GARDNER—10.

*For reversal*—None.