37 N.J. Super. 385 (1955)
117 A.2d 416
GALLOWHUR CHEMICAL CORPORATION, A CORPORATION, AND FRANK J. SOWA, PLAINTIFFS,
v.
ARTHUR SCHWERDLE, PAUL A. SARTORETTO AND W.A. CLEARY CORPORATION, A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 7, 1955.
*387 Messrs. Bilder, Bilder & Kaufman (Mr. Walter J. Bilder appearing), attorneys for plaintiffs; (Mr. A. Hayne De Yampert and Mr. Melvin Milligan, II, of the New York Bar, of counsel).
Messrs. Pitney, Hardin & Ward (Mr. Frank C. O'Brien, appearing), attorneys for defendants and counter-claimants Paul A. Sartoretto and W.A. Cleary Corporation (Mr. Charles J. Merriam, of the Illinois Bar, of counsel).
Mr. Clyde M. Noll, attorney for defendant Arthur Schwerdle.
*388 DREWEN, J.C.C. (temporarily assigned).
This is a secret process cause in the field of chemistry. The trial was uncommonly protracted. The testimony is voluminous, not to mention the depositions as well. The subject matter is scientific and technical, and the exhibits, which are equally so, are numerous. As might well be supposed, each side presented its array of learned experts, and all points of difference have been vigorously argued, orally and in copious briefs.
The problem in chemistry enclosed within the secret as alleged was the solubility of phenyl mercuric acetate in aqueous solutions. A statement of the factual background in somewhat extended detail is in order.
The plaintiff Sowa and defendants Schwerdle and Sartoretto are chemists by profession. In 1942 Sowa was engaged in chemical and scientific research for the plaintiff Gallowhur Chemical Corporation (herein called Gallowhur). By agreement between them, Sowa and Gallowhur were jointly interested in all profits derived from the sale of products manufactured from the processes developed in Sowa's research. At the time here referred to defendant Schwerdle was in Sowa's employ at the latter's New York laboratory, and continued so to be for a time thereafter. Also working in the Sowa laboratory was the defendant Sartoretto. His employment was not directly under Sowa, he being an employee of the American Machine and Foundry Company (no party to this cause), which company by agreement was availing itself of Sowa's laboratory facilities. In the language of the complaint, "said research work related in part to the scientific problem of the stabilization and use of phenol mercury compounds and research into and testing and application of organo-mercurial elements and compounds." It is alleged further that all of such research was secret and confidential to the knowledge of Schwerdle and Sartoretto, and that both were lawfully required on their parts completely to maintain the secrecy of all such researched processes and experimentations in each and every of their stages and in all the developments and consequences thereof. As for Schwerdle, he was *389 under express written agreement with Sowa to be bound and to keep secret "all * * * processes heretofore or hereafter used or developed by Sowa," the time limit being "unless and until published."
During the period in question there was developed in the Sowa laboratory methods of solubilizing phenyl mercuric acetate that are claimed to have been within the secret stated, and knowledge of which is likewise claimed to have been acquired by Schwerdle and Sartoretto within the confidential relationship described.
Eventually Schwerdle and Sartoretto discontinued their respective employments in the Sowa laboratory, and became organizers of and stockholders in a corporation known as American Research Associates. The circumstances surrounding their becoming so identified should be stated. On June 2, 1945 the two defendants here referred to entered into an agreement with one W.A. Cleary, one Russell Cook and one Morgan Seiffert, to form a corporation whose chief purpose would be to carry on research for the defendant W.A. Cleary Corporation (hereinafter called Cleary). The said W.A. Cleary, Cook and Seiffert were at the time respectively the president, vice-president and the secretary of Cleary. Pursuant to the agreement made by Schwerdle and Sartoretto with the persons named, American Research Associates, Inc. came into being, its certificate of incorporation having been filed in February 1946.
Plaintiffs charge that at the time of this association of Schwerdle and Sartoretto with the named personnel of Cleary, the said W.A. Cleary, its president, had been made aware of the fact of Schwerdle's and Sartoretto's participation in the research carried on at the Sowa laboratory and of the fact, as alleged, that both were possessed of secrets there learned by them in the development of solutions of the chemical problem and problems above-stated. Plaintiffs allege further that Cleary acquired knowledge of such secret processes through the illegal divulging thereof to the said W.A. Cleary by Schwerdle and Sartoretto, in violation of the secrecy legally enjoined upon them.
*390 It does not appear to be in dispute that Schwerdle and Sartoretto, when they began work in the Sowa laboratory, knew very little if anything about the solubilizing of phenyl mercuric acetate. It is not disputed either that Schwerdle, in addition to the general circumstance that prescribed and imposed upon him the bond of secrecy aforementioned, was obligated by express agreement in writing, as already noted. Sartoretto had been a pupil of Dr. Sowa at Notre Dame University, and Sowa had been helpful in securing Sartoretto's employment by the American Machine and Foundry Company for work in Sowa's laboratory. It is shown also that when each of these two defendants left the Sowa laboratory they were more or less familiar with the processes that had been developed there toward the solving of the problem already stated; that Cleary, prior to the association with it of Schwerdle and Sartoretto in the manner set forth, had at no time been engaged in research or in the manufacture of products involving the solubilization of phenyl mercuric acetates; that after Cleary had become so associated through the medium of American Research Associates, Inc. it did engage in such production, and that the processes used by it appear to be similar to those developed and owned by the plaintiff.
Basically, the subject matter of this dispute comprises two chemical processes that are claimed to have become effective in the accomplishment of the desired solubilization, plus the claim that both of them were originally developed by Sowa. One of these processes is characterized by the use of alkanolomines with acids, and the other by the use of ammonium salts with ammonium hydroxide. These will be referred to as the alkanolomine process and the ammonium process, respectively. The final development of these procedures by Sowa occurred circa 1942-3 and patent applications thereon were made in those years. Patents were granted, four in all, but not until 1946 and 1947. For convenience the patents will be separately designated by the terminal figures of their respective patent numbers (all antecedent digits in the several numbers being the same for each patent), viz.: -121, *391 -261, -262 and -815. The first, second and third cover the alkanolomine process and the fourth covers the ammonium salts process.
It is important to note, as will become more apparent later, that in 1947 patent infringement and unfair competition suits were instituted by Gallowhur and Cleary, each against the other, on the alkanolomine process; and that both suits were formally discontinued by agreement of release and license  the license covering the ammonium salts process  concerning which there will be further details. Upon the inception of the 1947 litigation Cleary ceased using the process claimed by plaintiffs to have infringed the alkanolomine patents; and in March 1948 it began the use of the processes concerning which there appears to be no serious dispute that it comes within the sphere, if not the prohibition, of plaintiff's patent -815 (the ammonium salts process).
The first of the defenses to be noted is that plaintiffs, entirely apart from anything charged against defendants, did not preserve their processes in sufficient secrecy to warrant their being classified as trade secrets at all. Sartoretto declares that he was not informed that any secrecy attached to what was going on and that he was never admonished in any way to keep secret what he learned regarding the processes in question. It may be taken from his testimony, moreover, that it is his contention that much of what he learned was thrust upon him by Sowa at luncheons and similar occasions, and that the purpose of Sowa's converse with him at such times was to acquire Sartoretto's opinion and advice concerning the matters discussed, without compensation therefor. More particularly, defendants show that conversations about the alleged secrets were carried on with them by Sowa freely and openly in public places, one of these being spoken of in the testimony as "Rudy's Bar," where, as stated, any one might have overheard what was being said. Since the affairs of kings, not to mention the course of planets, may be talked of anywhere, there is no reason to suppose that the problems of high emprise in the measureless realm of chemistry were not at times discussed in "Rudy's Bar." But *392 I think it far less than probable that any of these recondite data were or could have been snared in transitu by the chance listening of other patrons of the place, assuming they were interested at all.
Defendants urge also that "there is an absolute vacuum in plaintiff's case as to any proofs to establish any semblance of secrecy at the various establishments of Gallowhur * * * where operations began as early as January 1, 1943 * * *." But there is no proof either that anything escaped or could have escaped from the laboratories for the want of requisite precaution. Had defendants thought this matter vital they might have vigorously pressed the cross-examination, for example, of the witness Wiggans in this regard. In any event, the relevant principle is plain that plaintiff "is entitled to the benefit of its secret device so long only as it preserves its secrecy." Globe Ticket Co. v. International Ticket Co., 90 N.J. Eq. 605, 610 (E. & A. 1919). Yet in applying that principle we must consider the nature of the thing here involved, which is I think, to state it moderately, a fairly complex chemical process, impervious to anything like ordinary apprehension. Whether a guarding of the secret with reasonably adequate precaution, apart from the divulging that is charged here, is an essential element of plaintiffs' affirmative proof, and whether the burden of that proof has been carried, I find it unnecessary to decide, in the face of the other clear and determinative factors present.
It is contended for Schwerdle and Sartoretto that as between them and plaintiffs no relation is shown of such a confidential nature as to be lawfully subjected to the predication of secrecy for which plaintiffs argue. I think there is no merit in this. That both were equipped mentally for opportunities of access is basic in the case. As for Schwerdle, he recognized the element of secrecy by his agreement in writing to observe it. As for Sartoretto, he was a friend, not to say an intimate, of Schwerdle's and there is ample in the proofs from which to infer that he also had physical access to the experimentations carried on in the place of his and Schwerdle's employment. It is further inferrible that Sartoretto's personal *393 friendship with Sowa, probably going back to college days, his own work and training and the interests and objectives normally inherent therein with respect to the discovery of secret chemical processes, must plainly have indicated to him the need for secrecy.
Considering, first, the ammonium salts process apart from the other, defendants claim that it cannot be said to have the status of a trade secret because it was known in the "prior art," or in the earlier published literature on the subject or both. Especially relied on by defendants are the early discoveries or theories of one Pesci, as revealed in the published writings of that investigator in the field of chemistry. The relation of the Pesci text to the prior art with which we are presently concerned was severally expounded from the witness stand by the opposing experts, and I find no probative basis, for the reason I shall state, for specific findings as to which of the expressed views is to be accepted to the exclusion of the other. As so often happens when highly technical and scientific concepts are in evidential conflict and the voice of qualified, not to say eminent, authority is heard on both sides, the probative result here, in this and other like particulars, has turned out, in my judgment, to be one of static equipoise. Fortunately for the clearer course of justice there are other tangible preponderances that compel the ultimate decision.
More generally, defendants urge that a confidential disclosure of an idea already known cannot have the character of a trade secret or place the person to whom the idea is disclosed under an obligation not to exploit or divulge it; that such an idea cannot, in a word, be deemed confidential. I think the truth of this must at once be recognized. Smoley v. New Jersey Zinc Co., 24 F. Supp. 294, 300 (D.C.N.J. 1938), affirmed 106 F.2d 314 (3d Circ. 1939). My examination of the cases in this connection brings me to the further conclusion that "prior art" is, in the nature of things, a much less effective defense in a trade secret case than in a patent infringement case. "Novelty and invention are not essential for trade secret as they are for patentability." Sun Dial Corp. v. Rideout, 16 N.J. 252, 257 (1954). And see Franke *394 v. Wiltschek, 209 F.2d 493 (2d Circ. 1953); Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104 (7th Circ. 1936). Relevant and interesting dicta is found in L.M. Rabinowitz & Co. v. Dasher, Sup., 82 N.Y.S.2d 431, 438 (1948):
"The Court will not speculate on whether Dasher or the other defendants might have waded through the `prior art' and perhaps might have acquired enough information to be able to construct imitations of plaintiff's machines * * *. The fact remains that until Dasher copied the plaintiff's machines, no one else had constructed one which was nearly as good as the plaintiff's."
There is testimony, and defendants urge its preponderance, that the alkanolamine process was not plaintiff's but a unique process of Cleary's own, resulting from independent research. The argument from the proof is that Sartoretto in the fall of 1944, while employed by American Machine and Foundry Co. (but after his termination of all relationship with Sowa and the Sowa laboratory), was encouraged by plaintiff Gallowhur's vice-president, one Tilt, to do research in the solubilizing of phenyl mercuric acetate. Sartoretto says that he purposely did not use Sowa's method because it was unstable. Defendants say, too, that no attempt was made to use Sowa's process, even if secret, because the instability of Sowa's product was the very incentive that moved Tilt to encourage Sartoretto to undertake the research he suggested. Sartoretto says that at this juncture he knew that triethanolamine had been used to solubilize P.M.A. (Phenyl mercuric acetate) and that this fact was "common knowledge in the trade" through various publications as well as from disclosures by Sowa himself. Sartoretto says further that he found a solubilizing agent called Trigamine which was far more stable than Sowa's at similar concentrations. Trigamine, Sartoretto testifies, was a product sold by Glyco Products Co., and that the witness's process consisted of synthesizing 10 parts Trigamine, 10 parts P.M.A. and 80 parts water, and that he made this discovery in a matter of minutes. He exhibited in court what he represented to be a sample product of this experiment. Sartoretto adds that thereafter, in January 1945, he told Tilt *395 that he, Sartoretto, had a stable solution of P.M.A., but that Tilt was no longer interested.
It is further to be observed from the testimony that Sartoretto, following the formation of American Research Associates on June 2, 1945, spent the next several months researching for the Associates the possibilities of an "invention" of Sartoretto's called S-mercurial; that experiments apparently had proved S-mercurial to be relatively ineffective for the purpose intended (that is, a bacteriacide or fungicide), and that Sartoretto thereupon renewed his research into the Trigamine process; that, hoping to patent this process, he undertook an analysis of Trigamine to determine its composition. In the summer of 1946 he claims to have found Trigamine to be composed of monoethanolamine and boric acid. It was at or about this time that Sartoretto became an employee of Cleary, continuing at the same time his affiliation with American Research Associates. Sartoretto adds that he experimented with various ratios of the two ingredients stated (monoethanolamine and boric acid), arriving at what he considered "a good stable solution." More especially, a small change in the molecular ratio is claimed to have been accomplished, that is a proportionately larger amount of boric acid. The use of this process (referred to as the synthetic trigamine process) was continued by Cleary until the fall of 1947, when it was permanently discontinued.
I find no substantial or effectual contradiction, in whole or in part, of the foregoing narrative from the proofs, of Sartoretto's independent development of the process described. The pith of plaintiffs' claim respecting Sartoretto's contention is that the testimony is unworthy of belief. In the face of this, my appraisal of credibility here obliges me to assert that from a careful scrutiny of Sartoretto in court and on the witness stand, as well as from as close a scrutiny as I am capable of giving to the substance of what he says, that he cannot be rightly suspected of testimonial unveracity. The court finds him to be a credible witness in the case. And since Schwerdle is under similar attack by plaintiffs, and lest the omission of his name at this point be given invidious *396 implications, I make the same pronouncement upon the testimonial credibility of Schwerdle as I do upon that of Sartoretto, allowing, of course, for honest failure of memory in the totally lengthy testimony given by both men on depositions and in court. In Telechron, Inc., v. Parissi, 120 F. Supp. 235, 241 (D.C.N.D.N.Y. 1954), the court said:
"To disbelieve these men [the court] would have to brand them as outright perjurers and arch-villains in the business world. * * * The proof of the [plaintiffs] upon this issue establishes merely suspicion, and is overcome completely by the strong evidence as to independent development."
In New Jersey our courts have recognized the problem of drawing a line between acceptable and improper conduct in these situations:
"There is undoubtedly * * * an important policy which `encourages employes to seek better jobs from other employers or to go into business for themselves.' * * * But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence * * *. Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such." Sun Dial Corp. v. Rideout, supra, 16 N.J. 260, 261.
One feature of the case respecting disclosure other than by patent issue is a lecture delivered by Dr. Sowa himself at a meeting of the American Chemical Society in 1944; and at this point a parenthetical observation is in order. In connection with the question of disclosure by patent issue or otherwise, it will be necessary to consider, in the light of the decisions, whether misappropriation of the claimed secret is shown to have occurred prior to any disclosure in question, that is, while the secret was still intact. And since that factual detail will continue to be relevant to the question now dealt with, viz.,  whether the obligation of secrecy was dissolved by publication or other disclosure, let me state that I *397 have been unable to find in the proofs a showing that any wrongful violation of secrecy charged against these defendants occurred prior to publication, that is publication by patent issue or publication by other actual open disclosure. Returning now to the Sowa lecture, a printed copy thereof was put in evidence, and it was accorded the learned scrutiny of opposing experts. It was interpreted by them for a determination of what was and was not revealed thereby. My finding with respect to the effect of the doctor's lectorial deliverance is induced by my crediting the testimony of defendants' experts as to what it disclosed to them, as that testimony is circumstantially corroborated by the very nature of the situation in which the lecturer had placed himself in discoursing to fellow chemists upon the subject in hand. Ostensibly and actually the deliverance was devoted to Dr. Sowa's alkanolomine process. Of course, the lecture text speaks for itself, and I find that the discourse in question, to say nothing of its having been printed, published and circulated, effectually divulged to the confraternity of chemists in general, as well as to all other interested and comprehending persons, all that is claimed to have been within the alkanolomine secret. Were Dr. Sowa but sufficiently suggestive to his hearers and readers, that would be enough, in my opinion, to lay upon plaintiffs the burden of proving that the lecture did not actually reveal the secret. I think one may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it.
A dominant issue in the cause is whether the granting of a patent (and likewise any other form of non-patent publication or disclosure), terminates the cause of action for violation of the secret involved, except only as to such violation as is shown to have occurred prior to the patent issuance or other disclosure. Since the trial of this cause our New Jersey Supreme Court has decided the case of Adolph Gottscho, Inc., v. American Marking Corp., 18 N.J. 467 (1955). It is my judgment that this decision resolves the conflict, as discussed in the briefs, between what may be *398 called the Shellmar line of decisions (Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104, 109 (7th Circ. 1936), and the Conmar line (Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2d Circ. 1949)). The Conmar line holds that the obligation to maintain secrecy ends with the issuance of a patent. The Shellmar line, or so it is contended by plaintiffs, takes the opposite view, but it should be noted that in the Shellmar case itself the relief was granted not to protect a property right but to penalize inequitable conduct. One of the questions in the Gottscho case, supra, was which of these lines of decision to follow. In that case one Jackson had learned trade secrets "in confidence while in the plaintiff's employ and improperly disclosed and used them long before the patents were issued." From the opinion we read further: "He [Jackson] contends, nevertheless, that the patents constituted public disclosures which automatically terminated the plaintiff's pre-existing cause of action against him and the Marking Corporation to the extent that it related to secrets disclosed by the patents. Although there are decisions which suggest support for his position, we believe that reason and weight of authority are to the contrary. * * *" Citing the Shellmar case and the others in its line as contrasted with the Conmar group of decisions, the court concludes: "We know of no persuasive reason for depriving the plaintiff of the benefit of its accrued cause of action because some of its secrets were later disclosed by the issuance of protective patents during the pendency of its action." (Italics supplied.) Be it noted that the right of action which the Gottscho case sustains is that covering breaches of the secret committed before the patent or other disclosure was made, in other words the "accrued cause of action."
In the present case the question, per contra, is whether one who has learned and preserved the trade secret in confidence  assuming these defendants acquired the secret  shall be denied the same status as the rest of the public after the inventor has voluntarily removed the secret by applying for and obtaining letters patent thereon or by otherwise revealing the secret himself. It is to be borne in mind that no trade *399 secret cause of action will lie against an ordinary member of the public for patent infringement, the only liability to be established being such as may result from infringement litigation. And always to be remembered is that the case sub judice is not for patent infringement.
Plaintiffs urge a trust concept as affecting the status of these defendants, arguing that the individual defendants here were fiduciaries. Accepting that hypothesis, let us pose a question. Where the fiduciary has kept his trust until after the inventor has voluntarily revealed its subject matter, should the fiduciary be penalized in a trade secret case (by contrast with the rest of the public) for having had the fiduciary status and faithfully maintained it? And still holding to the hypothesis of trust, is not the trust itself terminated by the trustor's publication? The answers appear to be obvious. To consonant effect is the statement of the United States Supreme Court in Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944):
"As a reward for inventions and to encourage their disclosure the United States offers a seventeen year monopoly to an inventor who refrains from keeping his invention a trade secret, but the quid pro quo is disclosure of a process or device in sufficient detail to enable one skilled in the art to practice the invention once the period of the monopoly has expired; and the same precision of disclosure is likewise essential to warn the industry concerned of the precise scope of the monopoly asserted."
And see 40 Am. Jur., Patents, sec. 94, p. 592.
There is clear authority in this State that disclosure terminates pre-existing obligations of secrecy. Carver v. Harr, 132 N.J. Eq. 207, 209 (Ch. 1942); Ferber Corp. v. Northern Industrial Products, Inc., 15 N.J. Super. 283, 287 (Ch. Div. 1951), affirmed 18 N.J. Super. 493 (App. Div. 1952); Seal-O-Matic, etc., Co. v. C. & M., etc., Inc., 21 N.J. Super. 311, 317 (Ch. Div. 1952). The following decisions in other jurisdictions are in point: Flanigan v. Ditto, Inc., 84 F.2d 490, 495 (7th Circ. 1936); Northup v. Reish, 200 F.2d 924, 929 (7th Circ. 1953); Kohloff v. Ford *400 Motor Co., 37 F. Supp. 470, 471 (D.C.S.D.N.Y. 1940); Sandlin v. Johnson, 141 F.2d 660, 661 (8th Circ. 1944); Sachs v. Cluett, Peabody & Co., 265 App. Div. 597, 39 N.Y.S.2d 853, 857 (App. Div. 1943), affirmed per cur. 291 N.Y. 772, 53 N.E.2d 241 (Ct. App. 1944).
In support of their contention under this head plaintiffs cite an array of cases. Shellmar Products Co. v. Allen, etc., supra; A.O. Smith Corp. v. Petroleum Iron Works, 73 F.2d 531 (6th Circ. 1935); Consolidated Boiler Corp. v. Bogue Electric Co., 141 N.J. Eq. 550 (Ch. 1948); Cornibert v. Cohn, 169 Misc. 285, 7 N.Y.S.2d 351 (Sup. Ct. 1938); Schavior v. American Rebonded Leather Co., 104 Conn. 472, 133 A. 582 (Sup. Ct. Err. 1926); Franke v. Wiltschek, 209 F.2d 493 (2d Circ. 1953); Heyden Chemical Corporation v. Burrell & Neidig, 2 N.J. Super. 467 (Ch. Div. 1949); Saco-Lowell Shops v. Reynolds, 141 F.2d 587 (4th Circ. 1944); Julius Hyman & Co. v. Velsicol Corp., 123 Colo. 563, 233 P.2d 977 (Colo. Sup. Ct. 1951). I cannot find that the cases cited support plaintiffs' position. Since they are so strongly relied on in so vital an aspect of the case, a brief review of their respective holdings is in order. In the Shellmar case the wrongful conduct clearly predated disclosure by patent issuance. There the wrongdoer had applied to the court for modification of a preliminary injunction. The application was denied because of applicant's former "inequitable conduct." In the A.O. Smith case the wrongful conduct was prior to the patent issuance, the patents as a matter of fact not having been issued until after the pendency of the case that is cited. The same is true of the Consolidated Boiler case. The latter case can be of no help to plaintiffs on the present question for another reason; the court does not discuss the effect of disclosure by patent issuance, that point apparently not having been raised by the parties. The Cornibert case would prima facie seem to lend some support to plaintiffs' contention here but the decision is inconsistent with that of a higher court in the same jurisdiction (Sachs v. Cluett Peabody & Co., supra [265 App. Div. 597, 39 N.Y.S.2d 857]). In the latter case the court said:
*401 "Since a patent amounts to publication, it follows that the right to rely on protection under the theory of trade secrets is lost forever upon the obtaining of a patent because the subject matter is no longer secret. * * * Once the trade secret has `escaped', unlike most things termed property, it cannot effectively be reduced to possession."
The Schavior case is a "prior art" case. No disclosure by plaintiff was involved by patent issuance to him or otherwise. The patent in the case was one of ancient vintage (1859) issued to a third party. And the question was whether plaintiff's process was novel in view of the existence of the old patent in the prior art.
Franke v. Wiltschek, supra, is also a "prior art" case. In Heyden Chemical Corporation v. Burrell & Neidig, supra, the court does not discuss disclosure by patent issuance. In the Saco-Lowell Shops case the alleged breach of secrecy was long prior to disclosure by patent issuance. There the misconduct was alleged to have occurred in 1937 while the patent did not issue until 1941. In the Julius Hyman case, the court found that defendants had wrongfully used the secrets prior to the time when patent applications (British) were open for public inspection. In the Northup case, supra, the court said, 200 F.2d, at page 929: "We think all the above decisions are sound but do not believe any of them, nor any other decision we have found, supports the plaintiff's contention in a case where, as here, the plaintiff has made a full disclosure to the public long before the defendant started to manufacture and sell the article." Also in Carter Products, Inc., v. Colgate-Palmolive Co., 130 F. Supp. 557 (U.S.D.C. Md. 1955), it is to be noted that the wrongful use there clearly antedated issuance of plaintiff's patent.
Stressing their contention for the fiduciary status attributed to defendants Schwerdle and Sartoretto, plaintiffs say: "Even if the rest of the world could force plaintiffs to put those patents to the judicial test of validity, Schwerdle and Sartoretto and their disclosee Cleary cannot do so." This brings into pertinence an observation by Justice Jacobs in the Gottscho case, supra, as to: "the marked changes in the *402 attitude of the law towards the need for commercial morality." Assuming, as the facts here plainly show, that defendants respected plaintiffs' secret  and again assuming them to have had it  though plaintiffs had themselves revealed it to the public; and assuming also, as is entirely possible, that plaintiffs' patents would upon judicial test be found invalid, would the law then be furthering the attainment of higher standards of commercial morality by permitting plaintiffs to enjoy a monopoly for which there was no legal or other sanction?
Plaintiffs would make much of the fact that Sartoretto filed application for a patent on his alleged alkanolomine process, arguing that the fact of such filing, taking place after Sowa's 1944 address to the Society and the other claimed publications of the secret, shows that Sartoretto, notwithstanding his averments, must be regarded as having actually recognized the alkanolomine process as secret. Plaintiffs cite in this connection Carter Products, Inc., v. Colgate, etc., supra, quoting (inter alia) from 130 F. Supp., at page 572: "Thus, the contention that this information was previously known in the trade is clearly inconsistent with Colgate's filing these two applications, covering the same subject matter." Actually, Sartoretto's application is proved to have been predicated on the theory that in his trigamine process there was uniqueness. It is the intent that underlay the patent application that we are dealing with, and that shows that the patent applied for was not designed to cover the same subject matter as that embraced in the Sowa process. But aside from this, it would appear that the foregoing argument and quoted dicta are irrelevant. Whether certain things are known in the trade is a question of fact entirely apart from and independent of later patent applications.
It is my judgment that the over-arching factor in this case is the document of release already mentioned, executed by and between Gallowhur and the Cleary Corporation, with endorsed approval by Sowa. In the light of the terms of that release it is important that a somewhat detailed background of its making be given. In 1947 Gallowhur brought *403 suit as aforementioned against one of Cleary's distributors in the United States District Court for the District of Virginia. The suit was for alleged infringement of plaintiffs' alkanolomine patents (patents -121 and -262). In the same year Cleary brought suit against Gallowhur in the United States District Court for the Southern District of New York, wherein Sowa intervened as co-defendant. In the New York suit Cleary charged Gallowhur with unfairly competing with Cleary's sale of solubilized phenyl mercuric acetate under the tradename PMAS; through, inter alia, offering to sell phenyl mercuric acetate solutions under that tradename; through accusations made to the customers of Cleary that Cleary had infringed or was infringing the patents stated; and through the institution of the infringement suit itself. Cleary alleged further that Gallowhur's patents were invalid and asked for an accounting, money damages, injunctive relief, and a judgment that the patents were invalid. Gallowhur and Sowa, in addition to their denial of wrongdoing, counterclaimed for substantially the same relief as demanded by them in the Virginia action, and for findings and judgments in its favor against Cleary corresponding to those sought by Cleary under its complaint. Though extensive depositions were taken, including those of Schwerdle and Sartoretto, neither of the cases was brought to trial. After three years of pendency they were terminated by the discontinuance and release now under consideration. That document included a license by Gallowhur, as assignee of both Sowa's alkanolomine and ammonium salts patents, permitting Cleary, in consideration of the money payments stated and of Cleary's recognition of the alkanolomine patents, to carry on production and sale of the goods produced by the process described in the said patent -815, that is the ammonium salts patent. The pertinent portions of the instrument of settlement and release had best be set forth. They are:
"Whereas there is now pending between the parties an action in the United States District Court for the Southern District of New York and an action in the Federal District Court for the District of Virginia, in which the licensor and sublicensee are respectively *404 plaintiffs and defendants, involving patents numbers 2423121 and 2423262 and the trademark `PMAS'; and
Whereas the parties hereto wish to terminate such actions and settle their claims against each other; and
Whereas sublicensee is desirous of obtaining a non-exclusive non-assignable license under patent No. 2411815, upon the terms and conditions hereinafter set forth;
Now, therefore, in consideration of the premises and the faithful performance of the covenants herein contained, the parties hereto do hereby mutually agree as follows:

* * * * * * * *
3. Licensor and sublicensee agree that the aforesaid actions shall be dismissed without costs to either party and with prejudice and the execution of this agreement constitutes a release and satisfaction of all antecedent claims between the parties hereto, whether or not contained and/or referred to in the aforesaid action. (Italics supplied.)

* * * * * * * *
5. Sublicensee hereby admits the validity of patents Nos. 2423121 and 2423262 heretofore recited and the right and interest of the licensor herein, and agrees that it will not at any time hereafter directly or indirectly contest the validity of any of said patents, or infringe upon the same.

* * * * * * * *
6. Licensor hereby grants to sublicensee and sublicensee hereby accepts from licensor, upon the terms and conditions hereinafter specified, a non-exclusive and non-assignable license to make, use and sell phenyl mercury compounds pursuant to patent No. 2411815, or any reissue or reissues thereof, to the full end of the term for which the said patent is issued unless sooner terminated as hereinafter provided.

* * * * * * * *
17. This agreement shall be interpreted in accordance with the laws of the State of New York."
Appended to the document are the following words signed by Sowa: "The within sublicense is hereby consented to."
Under the agreement (in parts not quoted above) Cleary was obliged to pay royalties on stipulated dates (the minimum royalty being $2,000 per annum), in default of which Gallowhur had the right to terminate the license. It appears that Cleary defaulted in a royalty payment due July 20, 1952 and that Gallowhur exercised its right of termination as of September 20, 1952.
Concededly, the issues in the federal litigation just reviewed centered in the processes covered by the patents -121 and *405 -262; and vitally integrated with the settlement of the suits is the license given to Cleary for the production and sale of goods under the processes covered by patent -815. Thus it is that both the alkanolomine and the ammonium salts processes presently in issue were directly and immediately involved. The meaning of the release must be commensurate, and in my view no serious question is presented that the document releases the secret process claims that are the subject of the instant cause.
Plaintiffs argue, in effect, that we must read into the release a separation of patent infringement claims from trade secret claims, and hold that only the infringement claims are released while the trade secret claims are retained. I find this position to be untenable on every ground. To hold otherwise would leave us with the egregious interpretation that while the parties were in ostensible terms achieving a plenary composition of their differences, based in part upon the new licensor and sublicensee agreement, they were in practical truth settling nothing. Indeed, if the document of April 1, 1950 could be held to have left the field open for so comprehensive a litigation as that now before us, it would follow that little or nothing, in a practical sense, was brought under settlement by the release itself. The parties cannot in reason be held to have intended so strangely futile a consequence. The very idea is logically repellent that Cleary under its license might produce and sell PMAS according to the patent -815, but not according to the persisting trade secret, so-called; or that Cleary could be held to have been released from infringements of patents -121 and -262 but not from suits for violating, subsequent to the issuance of the patents, the trade secrets that culminated in their issuance.
There can be no question, in my opinion, that at the time of release plaintiffs had in mind the charges now made by them. Long before Sowa had directly accused Sartoretto of pirating his ideas. And in plaintiffs' brief there is what amounts to an admission in this connection, where it is said: "Indeed, the violations [of trade secrets] were discovered in *406 the discussions after the suit was started, November 12, 1947."
The subject of the settlement and release is, to repeat, "all antecedent claims between the parties hereto, whether or not contained and/or referred to in the aforesaid action." To me it is clear that under all the circumstances of its origin and use the quoted language is susceptible of no other rational interpretation than that I have given it.
The document is by its terms, as we have seen, to be interpreted according to the laws of the State of New York. No proof has been submitted in that connection. In the absence thereof it will be presumed that common law principles prevail in the State of New York and that the common law of that state is the same as the common law of New Jersey. N.J.S. 2A:82-27; Bosze v. Metropolitan Life Ins. Co., 1 N.J. 5 (1948); Shepherd v. Ward, 5 N.J. 92 (1950); Klaiber v. Frank, 9 N.J. 1 (1952).
I hold that Schwerdle and Sartoretto as defendants here are equally affected with Cleary by the terms of the release. The reason is the familiar rule that release of one joint tortfeasor releases all. Moss v. Cherdak, 114 N.J.L. 332 (E. & A. 1935). It is requisite in this regard that we refer again to the Gottscho case, supra, in its dealing with the projected release of a joint tortfeasor. There plaintiff had entered into an agreement to discontinue a pending action "only as against Reinke and the Tool Company, and shall not claim any relief against them by way of injunction or damages in said action." A stipulation entered into the same day provided that the "action shall be dismissed only as to the defendants Alfred Reinke and Gus Reinke Machinery and Tool Co., with prejudice * * *." Defendants in the Gottscho case contended that the stipulation was a release not only of the named defendants but of all others as well. The Supreme Court's opinion contains an observation that recent decisions favor a resting of the doctrine on the theory that there may be but one satisfaction of a tortious wrong. The opinion goes on to state, however, that our Supreme Court favors the view "that the issue of whether a separate *407 settlement with one joint tortfeasor is made in full satisfaction or is made as a lesser compromise with the purpose of pursuing the other tortfeasors, is a factual one which will properly turn on the intention of the parties." The court notes that the stipulation before it contained no words of release, and that the language used ("only" etc.) clearly indicated that the intention of the parties was to release only the named defendants. The court concludes: "The stipulation may be viewed, both in terms and purpose, as a covenant not to sue rather than a general release."
In the first place, the absence of words of release in the document before the court in the Gottscho case is to be contrasted with the emphatic presence of such words in the instrument sub judice. Moreover, I find as a fact, having in mind the principle enunciated in the Gottscho opinion, that the instant release was intended by the parties to apply not only to Cleary but to Schwerdle and Sartoretto as well. Under all the circumstances out of which the making of the instrument proceeds, and considering the relations of the parties  Schwerdle and Sartoretto with the others, and all the sanctions aimed at, I am convinced that a more restricted conclusion would be contrary to reason and good sense, as well as being repugnant to the whole import of the settlement.
Plaintiffs offer no argument in the face of defendants' vigorously reasoned though anticipatory contention that Sowa is equally bound with Gallowhur as lessor in the document that Sowa endorsed with his approval. I think there can be no doubt that such is Sowa's position. Consider his relation with Gallowhur and the subject patents, plus his financial interest in the license agreement, as well as his status in the settled litigation, and no other conclusion is possible, in my opinion. This view would appear to be sound whether Gallowhur is to be considered as having the exclusive right to recover, or both Gallowhur and Sowa are considered as joint obligees. See 76 C.J.S., Release, § 46, pp. 676-677; Forbes v. First Camden Nat. Bank & Trust Co., 25 N.J. Super. 17, 22 (App. Div. 1953).
*408 Another contention of plaintiffs is that the instrument of release is ineffectual because of failure of consideration consequent upon the nonpayment of a matured royalty installment. That clause of the instrument is laid hold of which reads that the consideration for it is "the premises and the faithful performance of the covenants herein contained." This is a novel and belated contention in the case. It makes its first appearance in plaintiffs' reply brief. Defendants claim prejudice and assert that such a defense to the release, had it been previously made, could and would have been countered by proof of prior breach by Gallowhur under the license agreement. Maybe so. I think the suggested possibility gives clear cogency to the claim of prejudice. Nevertheless, a word as to the merits of what plaintiffs' aver. For all that paragraph 3 was to have been faithfully performed, it was so performed upon the execution of the agreement. And so for the greater part at least were "the premises," then and thereafter. Extensive change in the positions of both parties was contingent upon execution alone. To appreciate this we need but consider the terms. It is elementary that a legal document is to be read so that its parts are harmonized and do not stand in conflict with each other. Plaintiffs' construction would do violence to that precept, since the release is expressly conditioned not upon performance but upon execution of the agreement of release. And for it there was a plenitude of consideration.
Plaintiffs' contention for the theory of continuing tort is completely answered against it by the case it cites (Sachs v. Cluett Peabody, supra). As finally affirmed in the New York Supreme Court, that decision asserts the principle that disclosure of a trade secret (in that case patent issuance) abolishes the right of property in the secret and terminates any cause of action based thereon.
Schwerdle did not plead the defense of release as did Cleary and Sartoretto. Plaintiffs would now take advantage of the omission as against him. In every phase of the trial and argument counsel for plaintiffs and for Schwerdle have conducted themselves precisely as if Schwerdle had *409 pleaded and was entitled to that defense. Schwerdle argued the question of release fully in his trial memorandum. Meritoriously as well as on the facts the defense in question is equally available to both Schwerdle and Sartoretto. In the motion to dismiss at the close of the trial made by counsel for Schwerdle the defense of release was argued at length. Neither in plaintiffs' trial memorandum nor elsewhere, nor in any other statement made before or during the trial, nor upon the oral argument at the close thereof, has Schwerdle's right to this defense been denied. Had the question been raised at any stage of the proceedings the court would doubtless, under the circumstances, have ordered appropriate amendment of the pretrial order, were such a course required. That amendment is hereby made. The court deems this measure of correction, assuming its need, to be requisite to the prevention of manifest injustice.
We come finally to the counterclaims. While these are argued with uncommon vigor, when seen against the background of tangled, technical controversy that characterizes the cause as a whole, they suffer a certain diminution of force. Defendant relies on cited cases, conspicuous among which is that of A.B. Farquhar Co., Ltd. v. National Harrow Co., 102 F. 714, 715 (3rd Circ. 1900):
"Where notices are given or circulars distributed in good faith to warn against infringement, no wrong whatever is committed; but where, as is here averred, they are not made or issued with such intent, but in bad faith, and solely for the purpose of destroying the business of another, a very different case is presented * * *."
See also A. Hollander & Son, Inc., v. Imperial Fur Blending Corp., 2 N.J. 235, 245 (1949). Though the quotation begs the question before us, it does accentuate the element of bad faith, or malice. My ruling here must repose on broad grounds rather than on specific deficiencies in the respective cases made on the counterclaims. Appraising the position of plaintiffs in this connection, it is to be borne in mind that technical misjudgments of one's rights, honestly come by and so long as they are honestly maintained, do not become essential components of evil purpose. Enough has been said *410 throughout this opinion in the recital of basic patterns of fact to show that in all the prevailing circumstances there was what may be deemed reasonable ground for the belief on plaintiffs' part that the action taken by them against defendants properly lay. It may be thought that an obvious exception to this is to be seen in the bringing of the present suit notwithstanding the release of April 1, 1950. As to that, I am impressed by the honesty of the theory advanced, however naive and palpably wrong I deem that theory to be, that such release left unaffected all claims respecting trade secret violations. Good faith is a question of fact, and I do not believe that litigation such as this, so burdensome and so hazardous to the suitor, would have been undertaken had there been any realization that the underlying right to litigate had been effectively compromised by the document in question.
It is claimed that plaintiffs were under the obligation, following issuance of the circulars, to institute patent infringement litigation, and defendants rely on such cases as Adriance, Platt & Co. v. National Harrow Co., 121 F. 827 (2d Circ. 1903). A careful review of all the facts bearing on this point leads me to the conclusion that under the circumstances already adjudged the bringing of a trade secret action instead of one for infringement does not suffice to make that in itself an evidence of bad faith. It is to be remembered too that a patent infringement suit was brought by plaintiffs against Cleary in 1954.
The counterclaims are dismissed without prejudice, that is the dismissal shall be deemed res judicata, but not so as to defeat the purpose herein stated, the intent of this proviso being as follows. If, in the event of future litigation brought by plaintiffs or either of them against defendants or either of them, any matters or things submitted in proof under the counterclaims herein shall be or become relevant to a counterclaim for malice or bad faith in such future suit, then such matters or things may be availed of as evidence under the counterclaim in the future suit.
Judgment in accordance with the views hereinabove expressed.