**FLANIGAN v. DITTO, INC.**
**No. 5588.**

Circuit Court of Appeals, Seventh Circuit.
June 15, 1936.
Rehearing Denied July 17, 1936.

Carl V. Wisner, Sr., Carl V. Wisner, Jr., and James W. Davis, all of Chicago, Ill., for appellant.

William Beye, R. C. Stevenson, Arthur W. Carlson, Max W. Zabel, and Zabel, Carlson & Wells, all of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and AL-SCHULER, Circuit Judges.

ALSCHULER, Circuit Judge.

The judgment from which Flanigan appeals was rendered on a verdict which, at the close of all the evidence, the court directed in favor of the Ditto corporation on all the counts of the declaration save count 6, as to which a verdict for Flanigan for one dollar was directed.

Flanigan was an inventor and builder of duplicating machines. For several years before 1910 he had worked with or for a certain concern known as Billograph Co. In 1910 he was granted a United States patent on a duplicating machine, and had pending an application for another patent for improvements thereon. In the same year Ditto (then named Billograph Duplicator Company) was organized to take over the assets of the Billograph Co. and the interest therein of Flanigan, including his granted patent and the application. As a part of, or growing out of, this transaction, Flanigan and Ditto entered into a contract, under date of October 19, 1910, whereby Ditto agreed to pay Flanigan a graduated percentage of its gross sales of Billograph duplicators and other named items during the life of the issued patent, as well as of any patent which might issue on the pending application. The application resulted in a patent issued March 5, 1912.

Upon the execution of the contract Flanigan went to work for Ditto at a small salary. The business grew rapidly, and under date of July 28, 1915, the parties entered into a supplementary contract whereby during its term (which was for the life of the patents) Flanigan was to work exclusively for Ditto, and Ditto was to employ him at largely increased salary. It was provided that Ditto should have the assignment of any improvements Flanigan might make on the duplicating ma-

chines, and that Flanigan should receive an additional percentage of gross receipts up to 3 per cent. from sales of Billograph duplicators and rolls, provided that, if the annual net profits of the business were less than 15 per cent., his additional percentage was to be reduced in a specified proportion. It was further provided that this contract might be terminated by either party on six months' notice.

Under date of January 15, 1924, the parties entered into a third contract supplementary to the other two. By its terms Flanigan agreed to design a new duplicator at his own expense which would not be a mere improvement on his other machines, and within one year to submit it to Ditto, together with terms on which he would convey it to Ditto; and if the terms were not accepted by Ditto the new machine was to belong to Flanigan, who agreed that in such case he would not market it or use it, or permit this to be done, prior to January 1, 1928. The new machine was completed and tendered to Ditto within the time specified, with terms of sale, but was not accepted. Flanigan filed his application for a patent on the machine in 1925, and a patent thereon was issued to him in 1929.

In 1927 Ditto wrote Flanigan demanding assignment of the application for this patent upon the ground that it was a mere improvement of the original machine and, under the second contract, belonged to Ditto. Flanigan refused to make the assignment, and Ditto brought suit in the District Court for specific performance. In this suit final decree was entered June 5, 1931, dismissing the bill for want of equity.

The instant cause was begun July 31, 1931. The declaration contains counts upon each of the three contracts, alleging breaches thereof. Generally speaking, recovery is sought for the stipulated percentage upon gross sales of various items alleged to be covered by the first and second contracts for which Ditto had not made payment as therein agreed. We will consider such of the several items which Flanigan claims as we deem worthy of attention.

■ The first contract specified that commissions were to be paid "upon the annual gross sales of the party of the first part of *Billograph Duplicating machines,* machine parts (other than for repairs) and duplicating rolls." Flanigan maintains that "machine parts," of which many were sold during the term of the contract, were not included by Ditto in reckoning Flanigan's commissions. The contract specifies that such parts as were for repairs were not subject to commission. What of the machine parts which were sold were not for repairs in no manner appears. There is no evidence in the record which shows for what purposes such parts would be sold if not for repairs on machines. At any rate, there is no evidence to show that any parts were sold for any use other than for repairs.

■ Another contention is that no commission was paid on the sale of "roll racks" sold by Ditto. These "roll racks" are conveniences for depositing thereon the gelatinous rolls employed on the duplicating machine. The racks are in no sense a part of the duplicator itself, but are a sort of shelving or device for supporting or storing the rolls when they are not in use. Under the contracts no claim for commission upon sales of "roll racks" is sustainable.

■ A very considerable item contended for is that of stands whereon to rest the machines. In 1918 Flanigan designed such stands of tubular metal, and they went into very considerable use. The stand was not patented, nor was there any application for patent thereon. Thereafter many sales of duplicators were made with the stand, and many without it. It was optional with the buyer. It was testified that at least 40 per cent. of the duplicators were sold without stands. In our view of the undisputed evidence the stand was no part of the duplicator, but was just a convenience upon which it might rest, as any other support might be. The stands were not by the contracts a subject-matter of the commission.

■ There is some evidence bearing on the stands which should be considered. Flanigan testified that about the time he designed the stands he told the president of Ditto that the sales of them should be included in those whereon he was entitled to a percentage and that the president agreed this should be so. This president denied. If, as to the stands, the rights of the parties rested upon where the truth lay as between these witnesses, a jury question might thereby be raised under proper pleading. But if we are correct in our view that stands did not fall within the purview of the contracts for percentage to Flanigan, then any promise to pay commis-

sion on such sales would constitute another contract, which has not been sued upon and was not an issue in this cause.

■ Another considerable item is that of "roll coupons." It seems that the gelatinous rolls for these duplicators, which must frequently be renewed, were in large measure supplied through orders for a considerable number of them, which orders were given and paid for in advance at a reduced rate, the rolls to be delivered in the future as the customer called for them. It appears that in the very large business which the Ditto concern developed many such coupon books were paid for on which deliveries of rolls were never called for nor made, and that, for the many years in question, there now remains in the hands of Ditto over $50,000 for uncalled for and undelivered rolls whereon Flanigan has not been paid commission. Most, if not all, of this is of such long standing that there is little or no likelihood that deliveries of them will ever be called for or made. It seems that from 1918, when this plan of selling was inaugurated, to 1922, Ditto included the total amount of sales of these coupon books in the Flanigan account for commissions; but in 1922, under a new auditor, a change was made, and thereafter only such commissions on roll sales were credited or paid Flanigan as represented actual deliveries. We are satisfied on this record that, in strictness, this plan of selling coupon books did not of itself involve a *sale* of the rolls within the purview of the contracts. It was the placing of an order for rolls for which payment was made in advance, involving some discount as the inducement. It appears that in a few instances payment so made in advance was refunded to those demanding it. Whether refund could be compelled where the merchandise was not desired or called for, we need not consider. Whatever may be the legal relations between Ditto and the holders of such coupon books, the fact alone that Ditto retains all or part of the consideration for undelivered rolls does not in our judgment give Flanigan any claim for commission thereon.

■ A considerable claim is based upon the contention that in 1924, after the first two contracts had been in operation for many years, Flanigan designed and Ditto marketed another duplicating machine which they called "handy duplicator." This was a comparatively small and simple hand-operated duplicator which sold at very much less than the "Billograph Duplicators." It was testified for Flanigan that the object of its manufacture was to supply a simple and cheap duplicator which would attract purchasers, and would tend ultimately to lead to purchases of Ditto's higher priced machines. Duplicators are an old device and there were many varieties upon the market. Evidently the handy duplicator was deemed to involve no invention, since it does not appear that any application was made for a patent on it. In the five years next following their introduction, Ditto's sales of these machines aggregated about $50,000.

Flanigan claims that these machines were in essence the Billograph machine reduced in size. It seems that of the Billograph machine three sizes were made and sold long before the handy duplicator was designed. Of course Ditto could not escape the payment of commission on sales by merely still further reducing the proportions of the Billograph machine while preserving its essential and distinguishing features which were secured to Ditto by the patent. Nor could liability for commissions be escaped by putting out the machine of the contracts under a different name. But our study of the record clearly convinces us that the handy duplicator cannot possibly be classified as a machine of the Billograph type, nor as one which falls within the provisions of the contracts for the payment of commissions upon sales.

The fact that Flanigan designed the handy duplicator does not remotely suggest that he was to have commissions on sales of it over and above his salary—a salary which, under the second contract, commencing at $350 per month, had increased until it reached $8,000 per annum, not including the stipulated commissions. The designing of the handy duplicator was evidently one of those items of service for which the salary was being paid to Flanigan. We believe the record fairly shows that the handy duplicators were not included in those items which under the contracts carried commissions to Flanigan.

■ There is controversy as to whether, in figuring the percentage, Ditto was justified in first deducting from sales any trade discounts, returns of merchandise, allowances for defects in machines, and the trade-in price of old machines upon new ones. Neither contract makes specific pro-

vision on these subjects, but it had been the uniform practice of Ditto to deduct these items before figuring the commission.

As to trade discounts, returned merchandise, and allowances for defects in merchandise, we can see no reason in principle why these should not be first deducted. Trade discounts are in essence a reduction in sales prices in consideration of payment within specified times. They reduce by their amount the avails of the sales, and we see no reason why they should not be deducted for computation of commissions; and this is especially true respecting returned merchandise and allowances for defects. If machines or rolls were returned, and were either not paid for or the payment was afterwards refunded, the effect is to reduce the sales or receipts by that much.

The evidence is that, in trading in old machines for new ones, in the earlier years the old machines, taken in at an agreed price, were mostly scrapped, whereby the actual sale price for the new machine was in fact reduced by such trade-in allowance. In the later years the old machines taken in exchange were largely reconditioned and resold, and upon the sale price Flanigan received his commission. In all these practices we do not see where Flanigan has any lawful right of complaint.

It appears from the evidence that during all of the many years of close relationship between these parties substantially all the practices of which Flanigan now complains were in vogue, and that during such time purported annual settlements were made as required by the first and second contracts. True, Flanigan says that he never examined the books and never required, and was not given, a statement of the items entering into the settlements. But it appears that, at least for the last eight years of operation under the contracts, he was a member of Ditto's board of directors and an officer, with full right as such to inspect its books and accounts; and if, as he says, he himself did not have expertness in such things, he could have done as he subsequently did, employ an accountant to assist him. Inspection of the books and records does not appear ever to have been denied him. Even after the relations became strained and after they ceased, his accountant was accorded free access to the corporate books. Nor is it contended that the corporation concealed anything from him, or did anything to obscure or cover up transactions or entries. Whatever, if any, of ambiguity there was in or between these contracts Flanigan must have known, and he should have been put upon his guard as to whether or not they were resolved against his interests or rights. The evidence shows him to have been a man of affairs and intelligence, who for nearly twenty years had worked with appellee, realizing large and constantly growing returns from his relations with it, as doubtless the corporation also enjoyed from its relations with him.

We believe that Flanigan may not be permitted to close his eyes and assert his ignorance during all this time of what was going on, accepting from year to year the settlements as specified in his contracts, and then, when the relations between them have ceased, uproot the settlements of these many years upon the pretext that he did not know those facts which he could so readily have ascertained. Especially is this so when, as here, the evidence discloses no purposeful act on the part of appellee calculated to defraud or circumvent Flanigan. The situation here is in this respect very similar to that in Vance v. Chicago Portrait Co., 19 F.(2d) 981, where this court held that a long series of dealings between an employer and its employee respecting commissions on sales, with frequent settlements thereof, would not be disturbed. See, also, Whitney v. Fox, 166 U.S. 637, 17 S.Ct. 713, 41 L.Ed. 1145; Hemmick v. Standard Oil Co. (C. C.A.) 91 F. 332.

With this background of many years of relations and presumably closed transactions between the parties, we are satisfied that these assertions of claims, first put forth after all these relations between the parties had ended, are not only an afterthought, but that they are not sustained by the evidence, and that the District Court was right in directing the verdict accordingly.

■ Counts 5 and 7 of the declaration are predicated on the contention that under the third contract Flanigan designed and invented a new duplicator which was not a mere improvement of his old one, and exhibited it to Ditto, by whom it was refused; and that Ditto, with the information confidentially coming to it through the submission of the new machine, proceeded to copy it, and manufactured and sold such

machines, thereby realizing and receiving certain profits which it promised to pay Flanigan, but did not so do.

The practically undisputed evidence shows that immediately after the date of the third contract Flanigan began, at his own expense, to develop the new machine, and on October 23, 1924, he submitted to Ditto the model of it. Later he submitted the terms upon which Ditto might acquire it. Within the time, fixed by the contract Ditto rejected the proposition, and Flanigan afterwards withdrew the machine. On April 6, 1925, Flanigan filed an application for a patent on the new machine. At the time the patent issued (February 26, 1929) the second contract had been terminated by notice, and the first contract had just a few days to run, after which the contractual relations between the parties ceased. About the middle of 1929 Ditto began to manufacture and sell duplicating machines which appellant claims embodied some features of his submitted machine model; and this is the basis of counts 5 and 7.

Some years after the model was submitted to Ditto and by it declined, and some months after the contracts had expired and the patent had issued, Ditto appears for the first time to have done those things charged to have been an appropriation of Flanigan's last-named invention. The patent had been issued, whereby whatever of novelty was inherent in it was disclosed to the world—including Ditto. Such disclosure is the price which the inventor pays the Government for the exclusive time-limited monopoly of the invention which it grants the inventor by its patent contract. 35 U.S.C. § 33 (35 U.S.C.A. § 33); Evans v. Eaton, 7 Wheat. 356, 5 L. Ed. 472; 2 Robinson on Patents, § 663. If before the issuance of the patent the invention had been revealed in confidence to another who took advantage of it, appropriate relief in a proper action might be accorded. Booth v. Stutz Motor Car Co. (C.C.A.) 56 F.(2d) 962. But it does not appear from the evidence that any such advantage of this inventor was sought or taken by Ditto. It sought to maintain that the invention lawfully belonged to it under the second contract, but did not, under such claim, undertake to appropriate or practice the invention. It was not until after the inventor paid the price which the Government exacts for the monopoly it granted him, to wit, full disclosure of how to practice the invention, that Ditto assumed to do those things which the inventor here claims to have been an invasion of his rights.

The theory of counts 5 and 7 is, not that the patent was infringed, but that, from seeing and having the model, Ditto took advantage of the confidential disclosure to it of the machine, and copied it, making certain profits therefrom which equitably belong to Flanigan. The only evidence on the subject shows that the model of the new duplicator, which Flanigan had submitted to Ditto, showed all and only such novelties as were later secured to Flanigan by his last-mentioned patent.

In our judgment the evidence wholly fails to show that Ditto took advantage of Flanigan in this regard which these counts charge, and so, under the uncontradicted facts as disclosed by this record, a recovery under these counts could not have been sustained, and was properly denied by the court.

█ Count 6, as to which the court directed a verdict of one dollar in Flanigan's favor, sets up an agreement between the parties substantially like the third written contract between them. It does not refer to that agreement, but charges that Ditto agreed that if it did not accept, upon Flanigan's terms, the new machine which Flanigan would design, Ditto would make and sell the machine. The count further alleges that Ditto did not accept this duplicator, but that, in violation of the agreement set forth not to manufacture and sell the machine, it did in fact proceed to manufacture and sell them in great numbers, whereby large profits accrued to Ditto, and whereby Ditto became indebted to the appellant in the amount thereof, and promised to pay the same.

The only evidence offered to establish the promise alleged in the count was the third contract itself. This contract contains no provision, as alleged in the count, that Ditto agreed that in case it did not accept the new duplicator and the proposed terms it would not at any time thereafter manufacture and sell the duplicator, unless indeed such a promise may be inferred, as was appellant's contention in argument. We do not think such promise can properly be inferred. Flanigan might have presented as his new machine a contrivance as old as the hills and well known to those familiar with the art, and if merely because Ditto refused to accept it upon the proposed terms Ditto was ever after barred from

making use of it, a handicap would be thus placed upon Ditto which the contract does not by its terms impose, and which is not inferable therefrom. Besides, it does not appear from the evidence that Ditto made any drawings of the model, or did anything by reason of, or induced by, the submission of the model during the several years which intervened between the submission of the model and the disclosure through the patent.

The count being predicated upon an agreement by Ditto never to make or use the machine, and no such agreement appearing from the evidence, in our judgment the count falls for want of evidence to sustain it.

Although the court directed a nominal recovery on this count, in our judgment a directed verdict thereon for appellee would have been warranted; but since appellee took no appeal, the verdict as to this count may not be disturbed.

Upon appellee's pleas of statutes of limitations and of accord and satisfaction much argument was presented, which, however interesting, need not, in our view of the case, be here discussed; and for like reason we refrain from comment on various other controverted propositions not above considered.

Concluding as we do that the record discloses no serious error, the judgment of the District Court is affirmed.