Joe BOOP, Plaintiff,

v.

FORD MOTOR COMPANY, a corporation, and Dearborn Motors Corporation, a corporation, Defendants.

Civ. A. No. IP 56-C-13.

United States District Court
S. D. Indiana,
Indianapolis Division.

Jan. 27, 1959.

524

Carl Seet, and Hollowell & Hamill, Indianapolis, Ind., for plaintiff.

Ross, McCord, Ice & Miller, Indianapolis, Ind., for defendants.

STECKLER, Chief Judge.

Defendant Ford Motor Company[1] has filed a motion for summary judgment under Rule 56, 28 U.S.C.A.

Plaintiff Joe E. Boop[2] instituted this action in the Marion County Superior Court in January, 1956, naming as defendants Dearborn Motors Corporation[3] and Ford. Dearborn was never served and has not appeared. Ford removed the case to this Court.

Plaintiff, a farmer, alleges that he developed certain new and novel ideas for mounting a corn picker on a tractor, and particularly a Ford tractor; that these were revealed to representatives of Dearborn on several occasions between 1947 and 1952; and that Ford came out with mounted pickers in 1955. Plaintiff alleges that his ideas were incorporated in the Ford units.

Plaintiff's complaint is in three paragraphs. It is alleged in the first that defendants acquired from the plaintiff, by fraud and misrepresentations, certain new and novel ideas; in the second that plaintiff contracted to and did sell the new and novel ideas to the defendants, for which he has not been paid; and in the third, that defendants wrongfully converted to their own use the new and

1. Sometimes referred to as "Ford."

2. Sometimes referred to as "Boop" or "Plaintiff."

3. Sometimes referred to as "Dearborn."

novel ideas. Ford's answer denied all material allegations of the complaint.

The motion for summary judgment is based upon the depositions of plaintiff and of J. Leslie Foster, the affidavits of Clarence B. Richey, R. J. Helder and Robert J. Groves, and the interrogatories and answers of the parties thereto. Plaintiff also filed an affidavit and Ford filed a second affidavit of Richey.

■ Averments contained in Defendant's affidavits which are not controverted by the opposing party, other than in its unverified pleadings, must be, for the purposes of this motion, taken as true; unless, of course, such party files an affidavit pursuant to Rule 56(f) [4] giving good and sufficient reasons for his failure to file such statements, which has not been done here. Foster v. General Motors Corp., 7 Cir., 1951, 191 F.2d 907; and In re Yellow Transit Freight Lines, Inc., 7 Cir., 1953, 207 F.2d 602.

■ One of the purposes of summary judgment proceedings is to pierce the allegations of fact in the pleadings and eliminate those which cannot be supported by affidavit or otherwise. Lavine v. Shapiro, 7 Cir., 1958, 257 F.2d 14; Repsold v. New York Life Insurance Company, 7 Cir., 1954, 216 F.2d 479; and Albert Dickinson Co. v. Mellos Peanut Co., 7 Cir., 1950, 179 F.2d 265.

Ford contends that there is no genuine issue as to material facts on four points, namely that: (1) the alleged ideas of plaintiff were not new and novel; (2) the ideas were not used by Ford; (3) they were not disclosed to Ford in confidence; and (4) plaintiff agreed that his rights would be limited to valid patent claims and none are asserted in this case. Ford asserts that each is fatal to recovery under all paragraphs of the complaint.

■ In order for this Court to grant the motion of the defendant, it must appear that there is no real dispute between the parties with respect to the ma-

terial facts necessary to support one or more of the essential elements of each of plaintiff's three theories of recovery.

■ The parties really are not in dispute as to the state of the law. For plaintiff to prevail under the first paragraph of his complaint, it must appear that: (a) a representation made by agents of Ford (b) of a material fact, (c) which was false, (d) and which was made without belief in its truth or in a reckless manner without regard to its truth, (e) was relied upon by the plaintiff and induced him to make a disclosure in confidence (f) to his legal detriment. In order to show any loss by reason of alleged misrepresentation, plaintiff must establish, as indeed he has alleged, that the ideas which he claims defendant acquired by trick were sufficiently *new and novel* that his claimed ownership in them entitled him to legal protection. It must be established not only that the new and novel ideas of the plaintiff were acquired by artifice, but that the ideas so acquired were subsequently used by the defendant. All three elements—a new and novel idea, fraudulent acquisition, and subsequent use by the defendant—are essential to plaintiff's first claim for relief. Mitchell Novelty Co. v. United Mfg. Co., 7 Cir., 1952, 199 F.2d 462; Northup v. Reish, 7 Cir., 1953, 200 F.2d 924; Russell v. Wall Wire Products Co., 1956, 346 Mich. 581, 78 N.W.2d 149; Holder v. Smith, 1952, 122 Ind.App. 371, 105 N.E.2d 177; Liggett & Meyer Tobacco Co. v. Meyer, 1935, 101 Ind.App. 420, 194 N.E. 206; and Puente v. President and Fellows of Harvard College, 1 Cir., 1957, 248 F.2d 799.

■ To support the second paragraph, plaintiff must not only establish that there was either an express or implied agreement between the parties with respect to the alleged sale of the ideas disclosed by the plaintiff to the defendant, but must also establish that the ideas disclosed were new and novel and, therefore,

4. Rule 56(f) provides that "should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment * * *."

had attributes of property such that they could be the subject of contract and such that their disclosure would be sufficient consideration therefor. Russell v. Wall Wire Products Co., supra; Liggett & Meyer Tobacco Co. v. Meyer, supra; Soule v. Bon Ami Co., 1922, 201 App.Div. 794, 195 N.Y.S. 574; Masline v. New York, New Haven & Hudson Railway Co., 1921, 95 Conn. 702, 112 A. 639; General Plastics Corp. v. Borkland, Ind.App.1957, 145 N.E.2d 393; and Flanigan v. Ditto, 7 Cir., 1936, 84 F.2d 490; certiorari denied 1936, 299 U.S. 598, 57 S.Ct. 190, 81 L.Ed. 440.

■ For plaintiff to recover upon the third paragraph, he must establish that Ford acquired his ideas other than with his consent, or other than pursuant to a contractual relationship with him; that the ideas so acquired were new and novel and were utilized; and that by reason of such acquisition and utilization, the plaintiff was injured. If the ideas disclosed by Boop to the defendant were not new and novel or if the defendant has not utilized the ideas so acquired or disclosed those ideas to others who have utilized them, the plaintiff has no actionable rights. Kinnear-Weed Corp. v. Humble Oil & Refining Co., D.C.E.D.Tex. 1956, 150 F.Supp. 143; affirmed 5 Cir., 1958, 259 F.2d 398; Northup v. Reish, supra; Mitchell Novelty Co. v. United Mfg. Co., supra; Aktiebolaget Bofors v. United States, 1951, 90 U.S.App.D.C. 92, 194 F.2d 145; Newell v. O. A. Newton & Son Co., D.C.Del.1952, 104 F.Supp. 162; Russell v. Wall Wire Products Co., supra; and Franklin v. General Electric Co., Sup. 1956, 150 N.Y.S.2d 742.

Thus, to support any one of the three paragraphs of his complaint, plaintiff at the trial would have to establish at least the following: (1) disclosure of a new and novel idea, and (2) use thereof by the defendant.

If there is no genuine issue as to the material facts upon either the issue of (1) the new and novel character of the ideas, or (2) the use by Ford of the ideas, the existence of disputed facts with respect to any other matters alleged in the complaint is wholly irrelevant to the disposition of this motion.

■ In order to determine whether Ford is entitled to summary judgment as a matter of law, the Court may consider only those facts which are not in dispute and *plaintiff's* version of any facts, material to the issues involved in this motion, which *are* in dispute.

Plaintiff asserts that he has "developed" two corn pickers.

In 1945 he purchased an old Continental one-row fully mounted corn picker which had been manufactured commencing about 1927 for mounting upon the Ford-produced Fordson tractor. Boop owned a Ford tractor, and since the rear axle housing of the Ford did not bear the same spaced relation to the power take-off as the Fordson, he had to move the mounting brackets forward on the Continental frame to permit connection to the power take-off shaft. The change made the unit tail heavy. To maintain steering traction, plaintiff put a length of railroad iron on the front end of the tractor. The wagon elevator extended to the side. Sometime in 1946 plaintiff switched the wagon elevator to the rear and built a sub-frame, which was attached to the right rear of the old frame, to support bevel gears for driving the elevator in its changed position. A hitch point was added to permit the trailing of a wagon. Sometime in the fall of 1948 Boop removed the lever which mechanically raised and lowered the snapping unit and hooked the rear end of the frame to the hydraulic lift of the Ford tractor. The Continental picker included a rectangular frame which Boop did not change. All three components—the snapping unit, the husking bed and the wagon elevator—were firmly fixed in position so that when the snapping unit was raised or lowered, the entire unit tilted with the movement.

The Wood Bros.-Hancock Assembly was actually put together by Hancock Manufacturing Company of Greenfield, Indiana, in what the plaintiff really described as a joint enterprise. Boop entered into a contract with Hancock under

which Hancock agreed to do the engineering and to produce five units at no cost to Boop, to supply one unit to Boop, and to pay Boop $2,500. Hancock reserved an option, to be exercised within a year, to purchase all of Boop's rights for an additional $7,500, with a royalty payment for all units produced. Hancock never exercised the option and in fact produced only one picker, which was delivered to Boop. The picker was assembled from a Wood Bros. husking bed and snapping unit mounted on a rectangular frame similar to the old Continental.[5] A wagon elevator extended to the rear and was made of standard parts purchased from local supply houses. The unit was like the old Continental, with substitution in some places of sheaves and belts for sprockets and chains. The entire unit, like the Continental, was locked solidly to the frame. A connection was made to the hydraulic lift of the tractor in a similar manner to Boop's modification of the Continental. The entire unit tilted with the raising and lowering of the snapping unit, as did the Continental. The picker was completed in 1951. It was used by Boop to pick his corn crop that fall. It did not work too well and was discarded. Boop purchased a Wood Bros. pull-type picker with which he harvested his crop in 1952 and thereafter.

Boop obtained a patent No. 2,520,622 on his first picker, but never applied for one on the second picker. The patent was applied for after John Zich of Dearborn first visited Boop's farm, at which time Zich suggested procurement of a patent. It is stipulated that plaintiff asserts no rights under the patent in this action.

On November 18, 1947, John Zich of the sales department of Dearborn saw the Boop adaptation of the Continental picker at Boop's farm.[6] He came there at Boop's invitation, extended through Bill Howe of Indiana Tractor Sales, who had been requested to bring Zich there by Alonzo Snyder, a friend of Boop. At the time of the visit, Boop was busy with the vaccination of some hogs and told Zich and Howe to go on back to where the picker was and to look at it.

On February 5, 1948, Boop wrote to Zich at Dearborn saying that he had not heard from him and asking what his reaction to the picker was and stating that if Dearborn was not interested, he was "going to see another company." No reply was received from Zich, and without invitation, on September 30, Boop went to the office of Dearborn in Detroit, Michigan, and saw a Mr. H. G. Bailey. He had with him at the time several small photographs of the picker. Bailey refused to discuss the matter until an agreement card with reference to the disclosures was signed by Boop.[7] Plaintiff's description of the conversation with reference to the card was that Bailey indicated that the card would have to be signed, but that he (Boop) hadn't wanted to sign it, that Bailey explained it as an

---

5. Sometimes referred to as the "Wood Bros.-Hancock Assembly."

6. Sometimes referred to as the "Continental Adaptation."

7. The agreement card executed on that date reads as follows:

 "D M C – 157
 Agreement.
 In order to interest Dearborn Motors Corporation in certain ideas pertaining to corn picker represented by the undersigned to be of original and inventive character, and understanding that Dearborn Motors Corporation will consent to the disclosure of such ideas to its representatives only on the following conditions, the undersigned agrees with Dearborn Motors Corporation, in consideration of the foregoing that except as may be hereafter expressly provided otherwise by a written agreement executed by an officer of the Corporation, the rights and remedies of the undersigned arising out of such ideas or out of the disclosure thereof to, or the use thereof by, Dearborn Motors Corporation, or any of its representatives, shall be confined to such rights and remedies, if any, as may be accorded to the undersigned under the claims of issued United States patent.
 "(Signed) Joe E. Boop
 "Signature
 "(Signed) W. G. Bailey
 Witness
 "9/30/48
 "Date"
 (Boop Dep. Ex. 28)

528

agreement that if they used any of his ideas they would attempt to make a settlement for it, and that there was nothing binding in any way. Boop signed the card and discussed his picker with Bailey. At this time, according to the plaintiff, he also told Bailey that a picker could be made using standard Wood Bros. units from the pull-type picker manufactured by that company. On October 22, 1948, Boop wrote Bailey at Dearborn inviting someone to come down and see his picker, saying that he had it operating now with the hydraulic lift.

In November, 1948, Sawyer and Richey of Dearborn saw the Continental Adaptation at Boop's farm, and Richey took some pictures of the picker. On December 2, Boop wrote Bailey saying that he had not heard from Sawyer or Richey and that he was anxious to learn of the decision. On December 9, Richey advised Boop that they were developing implements for mounting at the rear of the tractor on standard mounting brackets and they were not interested in the design of the Continental in which a rectangular frame was mounted underneath the tractor axle. On December 24, Boop wrote to Henry Ford II of the Ford Motor Company saying that it looked like Sawyer, Richey and Bailey were trying to use his ideas and get around his patent. No answer was received from Ford, but on January 14, 1949, a letter was written to Boop by the patent counsel of Dearborn referring to the Boop letter to Mr. Ford. *In that letter it was stated that Boop had, on September 30, 1948, at Mr. Bailey's office, executed an agreement card "which outlines the conditions under which we will consider submission from persons outside our organization."* The letter went on to say, among other things, that Boop's picker was merely a Continental picker built originally to mount on a Fordson tractor, and that there were "relatively limited features of construction" which could embody patentable matter, that the engineering department was not interested in utilizing any of the features, and that no specific design had been settled upon for a picker.

After this letter, Boop made no further effort to contact either Dearborn or Ford, but sold his patent rights to Hancock Manufacturing, as above stated. He had, however, written Wood Bros. about his picker in September of 1950 and had merely received an acknowledgment of his letter.

Only after Hancock had failed to market the picker built with Wood Bros. units and to exercise the option did Boop again turn to Dearborn. Through E. E. Carmichael of Indiana Tractor Sales, Boop sought to have someone from Dearborn look at the Wood Bros.-Hancock Assembly. Zich wrote Carmichael on April 2, 1952, saying that if Boop were willing to sign the agreement card enclosed, that somebody would come down and look at his picker. The second card is substantially identical with the first card set forth in footnote 6 above. It was signed by Boop on April 4, 1952, and witnessed by his friend, Alonzo D. Snyder. There is no showing that there were any misstatements with reference to the meaning of this card or any misrepresentations or pressure by anyone in connection with its execution. In May, 1952, after return of the signed card, Richey and Zich saw the Wood Bros.-Hancock Assembly at Boop's farm, and Richey took some pictures of it. On June 4, 1952, Zich wrote Boop that Dearborn was not interested in the picker.

In 1955, Ford Motor Company came on the market with a one-row and two-row picker and a tricycle tractor. After the offering of these pickers by Ford, this suit was filed. Except for the one letter to Henry Ford II, which was never answered by Ford, all of Boop's contacts and correspondence were with representatives of Dearborn. Counsel for Boop and Ford differ as to the legal effect of this situation. It is appropriate, therefore, to briefly state the facts pertaining to Ford, Dearborn and Wood Bros. relationship.

Ford Motor Company is a Delaware corporation which has had its principal place of business in Dearborn, Michigan, for many years prior to any dates in-

volved in this controversy. Dearborn Motors Corporation was a Delaware corporation organized in 1946, in which some directors of Ford were also directors of Dearborn, but which was a completely separate corporation from Ford Motor Company. It purchased and distributed Ford tractors and its own line of farm implements. On August 1, 1953, Ford bought the principal assets, other than cash and receivables, of Dearborn. Dearborn did not go out of existence, but changed its name to Aurora Corporation. Prior to August 1, 1953, Bailey, Richey, Zich and Sawyer were employees of Dearborn. On August 1, 1953, Richey, Zich and Sawyer became employees of Ford. Wood Bros., Inc. was an old Iowa company engaged in producing farm implements and produced particularly the Wood Bros. pull-type corn picker. On August 1, 1947, Dearborn purchased all of the common stock of Wood Bros., Inc. (Iowa). On July 31, 1953, Wood Bros., Inc. (Delaware) purchased certain assets of Wood Bros., Inc. (Iowa) and became a wholly-owned subsidiary of Ford until its dissolution on consolidation with Ford on November 1, 1955.

### Confidential Disclosure.

Ford contends that since none of Boop's disclosures was made to Ford employees, it is not chargeable with any confidence. Counsel for Boop argues that Dearborn and Ford were so closely related as to be one corporation and that disclosures to Bailey, Richey, Zich and Sawyer were, therefore, disclosures to Ford. The Court, in its view of the case, need not pass upon this issue. Manifestly, if the plaintiff's contention is sound, the plaintiff must also accept the fact that any knowledge which belonged to Richey or to Dearborn, or to its subsidiary, Wood Bros., is knowledge of which Ford may claim benefit. Plaintiff cannot maintain that, through Dearborn employees, disclosures were in effect made to Ford, and at the same time repudiate knowledge of developments or of competing units which Dearborn and Wood Bros. and their employees already had at the time of the disclosures. So, as will be ap-

parent from the Court's position in this case, it is not necessary at this time to determine the effect of the existence of the separate entities!

In the view of the case hereafter expressed as to the absence of new and novel ideas, it is not necessary to pass on another question raised by the defendant: namely, the effect of the agreement card signed by the plaintiff. The Court does note that as to the second agreement card at least, there was no showing of any misrepresentation. In fact, the second card was signed after written notice of counsel for Dearborn as to its effect. A quite similar factual situation was involved in the case of Hisel v. Chrysler Corp., D.C.W.D.Mo.1951, 94 F. Supp. 996, and the principles there stated appear to be in point. As it is the second picker on which plaintiff really bottoms his claim, plaintiff's rights, by virtue of the agreement card, would be limited to his patent, on which he stipulates no claim is made. So, the second agreement card could also dispose of plaintiff's case!

Ford also argues that the record before the Court shows that Boop made no effort to keep his picker secret, that he sought to show it to one and all, and that he was the aggressor with Dearborn. His Wood Bros.-Hancock Assembly was the result of the efforts of others, as well as Boop. The fact that the Wood Bros.-Hancock Assembly was once optioned to someone else not only reflects the lack of secret treatment of the idea, but defeats any claim on contract. Boop's sale of the unit after his dealings with Dearborn is completely inconsistent with the second paragraph of the complaint claiming a contract, particularly since he claims that he theretofore, on September 30, 1948, in conversation with Bailey disclosed all his ideas. However, the Court again, in its view of the principal questions of this case, need not determine the case on these points!

### New and Novel Idea.

The idea which Boop claims he disclosed to Ford was a method for mounting standard Wood Bros. pull-type corn picker units (snapping unit and husking

bed) on a Ford tractor and providing the means for powering it.

In his affidavit, plaintiff states it thus:

"My ideas were to convert the pull-type machine (Wood Bros.) into a mounted picker to be mounted on a Ford tractor and power it so as to make it operate as a mounted corn picker."

(Boop Aff., p. 12)

It is claimed by the plaintiff, and it is admitted by Ford, that in some respects the one-row and two-row pickers of Ford were similar to the two pickers of Boop. But this claim, and the admission, really are determinative of nothing in this case. It is not enough that there were similarities between the pickers, for indeed all mounted pickers are and must, of necessity, be alike in many respects. For example, almost all mechanical corn pickers have three basic units—a snapping unit, a husking bed, and a wagon elevator. Many pickers have the same general configuration and orientation of the basic units. Many pickers are fully mounted on a tractor. All mounted pickers are driven from the tractor power take-off. Many pickers utilize a hydraulic lift for raising and lowering the snapping unit. Only those features in the Ford picker which can be found only in plaintiff's pickers and of which it can be shown that Ford was unaware, except through Boop, have any legal significance. For the plaintiff to prevail, it must appear that the ideas utilized by Ford in its pickers came from the plaintiff. A mere showing of similarity does not fulfill this requirement, particularly when such similarities as exist are found in other picker designs in existence prior to plaintiff's.

The real question in this case is whether Boop's pickers contained any new and novel deas which Ford utilized. On this there really is no genuine issue of fact. The affidavit of Clarence Richey contains reference to six patents: the Barnard patent, No. 1,690,809 issued November 6, 1928 on a one-row mounted picker; the Breunig patent, No. 1,707,075 issued March 26, 1929 on a one-row mounted picker; the Franzkowiak patent, No. 1,808,030 issued June 2, 1931 on a one-row mounted picker; the Coultas patent, No. 2,337,592 issued December 28, 1943 on a one-row mounted picker; the Hyman patent, No. 2,358,513 issued September 19, 1944 on a one-row mounted picker; and the Oehler patent, Reissue No. 21,542 reissued August 27, 1940 on a two-row picker. It is well settled that disclosures in patents are matters in the domain of public knowledge. Flanigan v. Ditto, supra; Kohloff v. Ford Motor Co., D.C.S.D.N.Y.1940, 37 F.Supp. 470; Gallowhur Chemical Corporation v. Arthur Schwerdle, 1955, 37 N.J.Super. 385, 117 A.2d 416; Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 1949, 172 F.2d 150.

It also appears in the Richey affidavit that since his graduation from Iowa State College in 1933, he had kept abreast of the developments in the corn picker field and had studied new ideas to be found in issued patents, equipment of various farm equipment manufacturers, trade journals and literature, and other sources, so even apart from the patent-knowledge rule, the affidavit shows knowledge of corn picker developments, through the engineer Richey, on the part of Dearborn and later of Ford.

Without analyzing these patents in detail, it is apparent that all of the principal features of Boop's two pickers, and indeed much more, is disclosed by the patents. For example, the Barnard patent, referred to above, contains the transverse bar mounting of the type utilized by Ford in its one-row picker. The rectangular frame which was in the original Continental which the plaintiff bought is disclosed in the Breunig patent. These patents also disclose not only a fully-mounted picker, but the basic components of a snapping unit, husking bed and wagon elevator, orientation of the units similar to the plaintiff's, and powering from the power take-off of the tractor, through power trains which are the full equivalent of plaintiff's.

Also, in the Richey affidavit there are advertisements and sales literature of

units on the market prior to the time that representatives of Dearborn saw plaintiff's pickers. For example, there were the old Continental, Belle City, and Nichols & Shepard pickers which were mounted pickers built in the late Twenties and early Thirties for Fordson tractor. Wood Bros., many years prior to 1940, had a semi-mounted one-row picker. McCormick-Deering had a two-row mounted picker. John Deere had a two-row picker on the market which utilized the tractor's hydraulic lift for raising and lowering the snapping unit, for more than two years prior to the time that Boop connected the hydraulic lift on his Ford tractor to the corn picker frame. McCormick-Deering had both a one-row and two-row picker on the market in 1947, and Allis-Chalmers had a two-row picker on the market in 1948. These latter three pickers utilized a hydraulic lift for raising and lowering the snapping unit.

Furthermore, J. Leslie Foster, an engineer of Wood Bros., in February, 1945, completed, for Wood Bros., the design of a one-row fully-mounted picker with a rearwardly-turned wagon elevator. The picker was designed for mounting on a Ford tractor and utilized the Ford tractor's hydraulic lift for raising and lowering the snapping unit and was also designed to use a standard Wood Bros. husking bed or a standard Wood Bros. snapping unit just as in plaintiff's Wood Bros.-Hancock Assembly. Richey had knowledge of and access to the Foster design while working for Dearborn. The plaintiff, in his affidavit, endeavors to demonstrate that the Foster design was not a workable one. However, the affidavit contains nothing which destroys the Foster design as an embodiment of the idea of mounting Wood Bros. units on a Ford tractor and raising and lowering the snapping unit by means of a tractor's hydraulic lift.

Now, if all of the ideas which the plaintiff had in either of his pickers were old and were known to Dearborn, the plaintiff's case must fall. Richey, in his affidavit, states that the points of similarity between the Ford pickers and those of the plaintiff,

"* * * are either inherent in all corn pickers or corn harvesters, or have been known in the industry and to the affiant and others familiar with such development prior to the Continental Adaptation or the Wood Bros.-Hancock Assembly. * * *"

(Richey Aff., p. 39)

of the plaintiff.

Nowhere in the affidavit of the plaintiff, or elsewhere in the depositions or interrogatories which are before the Court, is there any direct refutation of this most material fact. All that is in the record on this motion is found in the affidavit of the plaintiff and is contained in three sentences:

"With respect to my picker being new and novel, before I made my machine *I had never seen another machine like it,* and as far as my knowledge goes, my machine was the first of its design.

"I have examined the material submitted by Mr. Richey in his affidavit and *I cannot find any machine among his material that is like my design.* The only machines of which I have any knowledge that follow my design and ideas are the machines put out by the Ford Motor Company."

(Boop Aff., p. 16)

It would have been a simple matter for the plaintiff to have created an issue of fact on this subject by merely directly pointing out some one or more features of either of his two pickers which were incorporated in either of the two pickers of Ford that were not theretofore generally known. The plaintiff has not pointed out any such features, and indeed an examination of the mass of material in the affidavits indicates that there are no major features of either of the Ford pickers which were not disclosed in either issued patents or competing pickers. Even a simple affidavit by Boop, or someone knowledgeable in the field, that certain specific features were not known prior to

Boop's pickers would have created the issue.

In my opinion, the plaintiff's case must fail because it has not been made to appear that there were any new and novel ideas in either the Continental Adaptation or the Wood Bros.-Hancock Assembly.

Ford argues that its pickers were independently developed. The history of the development is set forth at length in the Richey affidavit. The Court need not pass upon this question because, in the view which the Court takes of the matter, it is but cumulative matter.

### Utilization of Ideas

It is admitted by Boop that Ford did not make use of standard Wood Bros. units in either its one-row or two-row picker. The snapping unit, husking bed and elevator are of new design, much lighter and more efficient than the old Wood Bros. units. It is frankly stated, both in the affidavit and the brief of counsel for Boop, that neither these individual units, nor anything within them, is claimed by Boop. Therefore, the only portion left of claimed ideas is the asserted idea for powering.

Boop in his affidavit stated:

" * * * the general relative positions of the principal units are identical and the powering of those units are either *identical or equivalent.*"

(Boop Aff., p. 11)

Other parts of the affidavit and a comparison of the units clearly show that the power sequences of the pickers are not identical. The second Richey affidavit, which demonstrates the lack of such identity, has not been challenged. The plaintiff's affidavit admits the powering is not the same.

So, plaintiff is left with the doctrine of "equivalents" to make his case on "use." The difficulty with his position is that the doctrine must be equally applicable to the "new and novel" point which the plaintiff must also sustain. The *alternative* use of sprockets and chains, sheaves and belts, gears and shafts, and universal joints for transmission of power, is very old. In fact, in the case of Sheffield Car Co. v. Buda Foundry & Mfg. Co., C.C.N.D.Ill.1910, 177 F. 713, 715, the court said:

" * * * To hold that defendant's tricycle infringes requires, among other things, that *its sprocket chain drive be held to be the equivalent of complainant's belt drive.*

"Complainant's expert, Cooley, says the two methods are recognized as equivalents. This seems to be reasonable, and, considered alone, is deemed true."

A person need not be an expert to have knowledge of the common interchangeability of such devices, nor is a citation of precedent necessary to establish that the changes were mere *obvious adaptations* that any one could make. Cf. Clapper v. Original Tractor Cab Co., D.C.S.D.Ind. 1958, 165 F.Supp. 565, 576. Examples of such alternative use, if any demonstration is necessary, are found in the several patents and other pickers on the market which appear in the Richey affidavit. All of the mentioned means of powering appear in the various pickers in every conceivable combination of the power transmission sequences. Nothing new and novel can be claimed in the power sequence. The resort to the doctrine of "equivalents" is an acknowledgement of interchangeability of well-known elements which defeats any claim of novelty.

Defendant's motion for summary judgment will be sustained as to all three paragraphs of the complaint.